IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| ST. CROIX RENAISSANCE GROUP, LLLP;<br>BROWNFIELD RECOVERY CORP. and<br>ENERGY ANSWERS CORPORATION OF<br>PUERTO RICO,<br><center>**Plaintiffs,**</center><br>   v.<br><br>ST. CROIX ALUMINA, LLC and ALCOA<br>WORLD ALUMINA, LLC,<br><br><center>**Defendants.**</center> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL NO.  2004/67**<br><br>**ACTION FOR DAMAGES** |

**PLAINTIFF SCRG'S MEMORANDUM IN SUPPORT
OF ITS MOTION REGARDING THE MATTER OF CLAIMS OF PRIVILEGE
AS TO DOCUMENTS IN THE POSSESSION OF, OR TRANSMITTED TO
GARVER ENGINEERING**

Joel H. Holt
2132 Company Street
Christiansted, St. Croix
USVI, 00820
Telephone: (340) 773-8709
Facsimile: (340) 773-8677

Carl J. Hartmann, III
5000 Estate Coakley Bay, L-6
Christiansted, VI 00820
Telephone: (340) 719-8941

June 19, 2009

## I. Introduction

Originally, there were some 328 documents, in two groups, to which this motion applies. After the Court ordered the documents to be produced *for in camera* inspection, 46 of these documents—clearly not privileged—were produced.

*1. Documents which were in Garver's possession.*  Garver Engineering is a key witness.  Garver was to bring documents responsive to a *duces tecum* request to the depositions of its Rule 30(b)(6) representative Earl Mott, as well as its St. Croix project director and liaison with Defendants, Marvin Dalla Rosa.  Garver assembled the responsive documents, but then turned them over to Alcoa's counsel.  On the day of those depositions, plaintiffs (SCRG) were informed that Alcoa would keep more than 200 of Garver's documents. Garver and Defendants then refused to produce the documents. Later, Defendants (Alcoa) served a log entitled "Garver Privilege Log", separate from their own.

*2. Documents in Alcoa's possession.*  In addition, there are a smaller number of additional documents in Alcoa's possession that had been sent or copied to Garver employees, for which Alcoa independently claims privilege.  These have not been produced either, and are on Alcoa's separate privilege log.

References are to the Joint Statement of Facts (SOF) and Plaintiff's Exhibits (PEx).

## II. Garver's Understanding of its Involvement in this Matter

Garver is a field engineering company. **SOF 8**.  Garver did not understand itself to be (nor was it) "on the litigation team", or an agent in any sort of privileged relationship with Alcoa's counsel or Alcoa itself.  Garver's St. Croix Project Director was Marvin Dalla Rosa.  Garver's 30(b)(6) representative (Mott) testified that Dalla Rosa was the person with the most knowledge of Garver's St. Croix involvement with Alcoa, the person who handled the contracts with Alcoa and the relationship manager for Garver with regard to the facility. *Deposition of Garver's 30(b)(6) representative, Mott* at (v.2) 22:4-23:19, (v.1) 34:13-35:2.

**PEx 1.** Dalla Rosa's testimony regarding Garver's understanding of its role in relation to

Alcoa was clear.

> Q. When you were working for Garver, what was the nature of the relationship between Garver and Alcoa?
> A. I believe we had worked for them for several years. Primarily, I believe, on the bauxite residue reclamation project out in the Benton/Bauxite area.
> Q. Would you characterize the relationship between Garver and Alcoa as typical of the relationships that Garver had with all of its clients?
> A. Typical in what way?
> Q. Well, did you have some sort of a special relationship with Alcoa?
> A. I think we had a good working relationship with them. I don't know that we had a special relationship with them.
> Q. Well, when I say special, I mean contractually special. Was there something in the agreement, the contractual agreements that you had with Gar- -- with Alcoa that was somehow atypical from the contracts that you had with your other clients?
> A. Not that I'm aware of. *Deposition of Marvin Dalla Rosa* at 83:2-21. **PEx 2**

The project manager could remember no confidentiality provision in any of the several

contracts, nor was one ever produced. There were no discussions cautioning confidentiality.

> Q. Did you have a confidentiality provision in your contracts with Alcoa?
> A. I -- not in a -- I don't know. I would have to look at their -- I haven't looked at their contract documents in several years. I don't remember.
> Q. Were you ever cautioned that the relationship between Garver and Alcoa was a confidential one?
> A. No. Id. at 83:22-84:13.

There were *never* any instructions to Garver, or even a particular conversation about

keeping communications with Alcoa confidential:

> Q. So you were never told, [']Well, the information you get from Alcoa about a particular project is something that you can't discuss with anybody else?[']
> A. Not in particular that I'm aware of, no.
> Q. Were you ever told that any particular conversations that you had with Alcoa personnel were confidential and that you should keep them to yourself and you couldn't disclose them to other people?
> A. Not in particular, no. Id. at 84:5-13.

Nor did he even know Alcoa's primary project counsel.

> Q. Do you know who Mark Ross is?
> A. No. I have not met Mark Ross.
> Q. Have you --
> A. I don't believe so. I don't think I've -- I do not know him.
> Q. Have you ever had any communications in which Mark Ross was a participant?

Case: 1:04-cv-00067-HB   Document #: 228   Filed: 06/19/09   Page 4 of 22
SCRG's Memorandum re Garver Documents
Page 3

A. I don't know. I don't know if he was -- he might have been CC'd on an e-mail or a party in a teleconference, but I don't -- I mean, a conference call, but I don't believe I've -- I don't know that I've ever personally met Mark.

Q. And in any of those communications, conference calls, e-mails or otherwise in which Mr. Ross might have been participatory in, were you ever cautioned not to disclose anything about those communications?

A. No, no. I can't recall that I ever had--I can't recall any that he was involved in [sic.] that I was.  Id at 8:14-85:6.

So Garver's project director and Garver liaison, Dalla Rosa, knew of nothing of any such expectations.  In fact, Garver's <u>only</u> testimony as to this alleged relationship was much later -- from Garver's 30(b)(6) witness -- that communications copied to Garver sometimes bore a legend that they were confidential and should not be shared. *Deposition of Mott* (v.2) 20:5-20:1. **PEx 1.**[1]  Thus, from Garver's point of view, Alcoa had no expectation of confidentiality, and the many invoices and contracts reflect no mention of any special relationship.

## III. Garver's Actual Involvement with Alcoa also Demonstrates an Absence of any Special Relationship or Expectation of Confidentiality

The long history of what actually took place is entirely consistent with Garver's understanding.  From 2001 to date, Garver went through several sub-projects in St. Croix -- as different engineering needs arose -- each equally prosaic, as discussed below.

### A. Garver's Initial Relationship to Alcoa: Re-Grading Engineers (1/01-6/02)

Garver Engineering was originally hired as an engineering consultant by Alcoa for the St. Croix project in early 2001.  Garver was to develop a plan to regrade *Bauxite Residue Area A* ("BRDA-A").**SOF 9**.  After initially submitting three alternatives, in mid-2001 Garver supplied such a plan.  Garver sent regular invoices to Alcoa, solely for engineering work.

While this grading was ongoing, on March 22, 2002, Alcoa and the buyers entered into a Purchase and Sales Agreement (PSA).  The closing was scheduled to occur thereafter. **SOF 1**.  The regrading continued until sometime before closing in June of 2002.

---

[1] Defendants' privilege log does not disclose which of the documents here bore that legend.

However, on April 16, 2002, a red mud discharge event into the Sea was discovered. **SOF 6**. At some time between signing of the PSA and April 16th, large amounts of red mud and water flowed from BRDA-A, along a road, into the West Ditch, through the mangroves and into the Sea. As a result, on April 17th, Alcoa's managers asked Garver to arrange to have "*engineering help* arrive onsite to evaluate current stormwater systems and develop a documented plan for inclusion in reports to regulatory agencies and to possible insurance carriers for the purchaser." **PEx 3**. (Emphasis added). There has been no evidence produced that Garver ever dealt with Alcoa's lawyers regarding this event.

On April 17, 2002, Alcoa sent an official notice of this discharge event to the Commissioner of the Virgin Islands Department of Planning and Natural Resources (DPNR). The St. Croix facility's environmental official, Dr. Eric Black, represented that Alcoa was investigating, and that there had been no prior, similar events:

> [Alcoa is] conducting an investigation into the probable cause of the reported event, as there have been no similar stormwater incidents prior to or apparently subsequent to this apparently one time event. **PEx 4.** (Emphasis added).

Representations of *no similar discharge events* (made by Alcoa both then and later) are critical in this matter. There is a factual issue as to whether, as was continuously maintained by Alcoa, this was a single such event -- or whether there had been multiple discharges over a long enough period of time that there was evidence of several cycles of erosion and deposition. Alcoa stridently maintained (both then and in discovery) there was no evidence of other such discharge events. However, later in discovery, after several denials, Alcoa supplied a contemporaneous document reflecting the opposite. An email was produced five working days after the entry of this Court's Magistrate's relevant order.

Marvin Dalla Rosa and one other Garver Engineer were at the facility on April 25-26, 2002. **PEx 5**. That internal Alcoa email reveals that on April 29, 2002, when returning from

Case: 1:04-cv-00067-HB   Document #: 228   Filed: 06/19/09   Page 6 of 22
SCRG's Memorandum re Garver Documents
Page 5

their trip to St. Croix, these Garver engineers called Alcoa's senior environmental

troubleshooter for Alcoa's subsidiary, Alcoa World Alumina (AWA), Joe Norton. They told

him the story being given to the DPNR and buyers though "plausible" was inconsistent with

the evidence.   Norton summarized Garver's directly opposite findings and conclusions in an

email to Larry Grace, Alcoa's lead negotiator for the sale of the property:

> I had an interesting conversation with the Garver folks on Saturday as they
> were returning from Stx.  Their observations were that the spill did not occur in
> a one-time event. While that is a plausible explanation, it does not explain the
> observations regarding the current condition.  In fact, Marvin [Dalla Rosa]
> indicated that the erosion and deposition appeared to have been going on
> through several discharge events.  **PEx 6**.

Notwithstanding this report of evidence of multiple releases, Alcoa never even hinted to the

regulators or buyers that Garver's engineers had found evidence directly conflicting with

Alcoa's "version" of one single release.[2]  A full disclosure then, of course, might have led to

the very inquiry which is now presented in this case: how could Alcoa's environmental

official, who was on the site for both Alcoa and the previous owners, possibly not know of

several unreported, outstanding violations of environmental laws?

In any event, Garver's role in this transaction was not privileged activity.   There was

never any communication of this information by Garver (or even Alcoa officials) to or from

Alcoa's counsel.   To the contrary, Norton sent the Garver findings to Larry Grace, the senior

---

[2] A confidential, internal DPNR memo obtained thereafter relates that a DPNR expert did a
field study near the point where such a discharge event would enter the Sea, in September
of 2002.  He discovered *identical* "layering" evidence of the multiple discharges with
depositions in between--just as Garver had in April 2002.  Alcoa concurred with the DPNR
expert's conclusion then--of multiple discharge events over some period of time.  **PEx 7** at
7.

> The red mud in the ditch had distinct layers separated by a white precipitate
> material. It appeared that the red mud in the ditch had accumulated over some
> period of time during several depositional events.  Alcoa concurred that due to
> the large amount of red mud in the ditch, it was unlikely that the total
> accumulation was deposited during the heavy rains of February-March 2002.

Alcoa official dealing with the facility.[3]  *Id.*  Grace decided he would never inform SCRG or

regulators that Garver found evidence for and reached the "several events" conclusion:

> "[t]he content of this email does not conclude that there were multiple events.
> It talks about erosions and deposition. . . .It doesn't talk about what those
> were. . . There's no evidence, there's no report from Garver that says there
> were several discharge events. . . .**Nothing was ever reported** in this respect.
> **I didn't think it was material."**  *Deposition of Grace as 30(b)(6)
> representative for Alcoa* at 204:23 - 207:5. **PEx 8.**  (Emphasis added.)

He is wrong of course, that is *exactly* what the email says, it says: the physical evidence is

of "several discharge events".  This non-disclosure was a decision at the *managerial level.*[4]

Not only did Alcoa and Garver's managers not disclose this information, they did the

exact opposite.  Writing as the engineers working on the property who had done the grading

plans; on May 9, 2002 (and again on June 11th) Garver sent a letter which was created to

be provided to SCRG and regulators.  Garver's Marvin Dalla Rosa wrote of Garver's visit on

April 25-26, 2002, but did not mention one word about the conclusion as to "several

discharge events" or findings of cycles of "erosions and deposition". **PEx 11.**  Never in

repeated testimony, many court filings or extensive correspondence did Alcoa or Garver

disclose this information or the fact that they were in possession of it prior to closing and the

DPNR's June 18, 2002 order (discussed below).  To the contrary, Garver admitted that

---

[3] Joseph Norton, Larry Grace and Eric Black are all listed in the Section 8.3 of the PSA as
being yardsticks of Alcoa's "knowledge" with regard to these applicable warranties.

[4]  Moreover, neither Alcoa nor Garver ever informed their own environmental consultant
studying the discharge event (BioImpact) of Garver's findings or conclusions.  BioImpact
testified that the report (submitted to regulators and SCRG) was made without the
knowledge that Garver had found scientific, engineering evidence for and reached the
conclusion of "several discharge events".  *BioImpact (Dempsey) Deposition* at 84:14 -
93:14.  **PEx 9.**  The "BioImpact Report" submitted by Alcoa, was never corrected or
amended before being used by DPNR.  As discussed below, this report formed a substantial
basis for the amendment to the PSA just a day before closing and almost all of the
regulatory activity thereafter.  That report was almost the entire factual predicate for the
critical June 18, 2002 DPNR Administrative Order at issue here.  **PEx 10.**

Alcoa participated in re-drafting this letter (and others represented by Alcoa to be from the

engineers). Thus, Garver clearly understood it was working for a regular business client.

> Q. Okay. So -- and correct me if I'm wrong -- what might appear to third parties to actually be letters from you to Alcoa would actually be in cases actually collaborative projects which were jointly drafted?
> A. In some instances that would be correct.
> Q. Okay. And those would be in important situations, for instance, when you would be submitting materials to agencies or regulatory bodies?
> A. That would be correct. *Mott Deposition* at (v.1) 34:13-40:2 *and* 74:23-77-21. **PEx 1**.

In this action, Plaintiffs contend this pattern of intentionally not disclosing and, rather, hiding

outstanding Clean Water Act and local environmental law violations is one of the acts

contrary to the warranties. There is no evidence of privileged communication regarding this

activity and, certainly, no lawyer to whom Garver's findings and conclusions had been

communicated would have allowed or participated in such testimony or submissions.

### B. Garver as Designers of the Remediation "Garver Plan" (6/02 - 11/03)

Referencing that *BioImpact Report*, the parties signed a letter amendment to the

March 22, 2002 PSA, the day before the June 14th closing. **SOF 4-5**, **PEx 12**.

> 6.2 Seller's Retained Liabilities.  Seller has retained all liability for the following matters ("Seller's Retained Liabilities"):...
>
> (e) all liability arising out of that certain release of. . . .that certain release of red mud into the wetlands and the sea on or about March and April, 2002, as described in the Assessment of the Extent of the Red Mud Spill and Impact Assessment prepared by BioImpact, Inc., dated April 20, 2002 for the Seller (the "Red Mud Release"),. . . .including, but not limited to all corrective action required by the U.S. Environmental Protection Agency, the Government of the Virgin Islands of the United States, Department of Planning and Natural Resources, Division of Environmental Protection and any other governmental body or agency having jurisdiction over this matter, in order to correct, clean up, minimize, mitigate or otherwise cure the Release. . . .with the understanding that the Seller retains any and all liability arising out of any notice, claim, administrative proceeding or litigation brought by any party or entity which arises out of the Release and the Supplemental Order; provided, however, that in connection with the Red Mud Release, Seller shall not be responsible for contouring or vegetation of the bauxite residue disposal areas, or any other work in the bauxite residue disposal areas.

This provision also had a mechanism for oversight.

If and when the DPNR requires corrective action in connection with the foregoing, Seller will complete such corrective action to DPNR's satisfaction at Seller's expense, subject to the limitations described above. . .The Seller reserves its right to the extent provided by law to challenge any actions of the DPNR that it, in its sole discretion, deems to be unreasonable, impractical, arbitrary, capricious, unduly burdensome, contrary to fact, or contrary to law. The Purchaser shall be responsible for all liability associated with contouring or vegetation of the bauxite residue disposal areas or other work in the bauxite residue disposal areas. . . .The provisions of this Section 6.2(e) shall survive. . . (Emphasis added.)

Immediately thereafter, on June 18, 2002, DPNR issued an *Administrative Order* to Alcoa regarding that spring 2002 discharge event (**SOF 7**) relying on and incorporating BioImpact's report in significant part. Alcoa was ordered to do the following:

1c. SCA shall improve, maintain and monitor the dams/berms installed to prevent continued or additional red mud releases into the environment.

1d. In order to minimize the potential for future impacts to the environment from additional red mud or other unauthorized discharges, all proposed clean up items described in the April 20, 2002, BIOIMPACT report, shall be performed by SCA.
* * *
1f. SCA shall perform a structural evaluation, redesign/expand (if required) and provide a report on the red mud sediment control system <u>to insure that is [sic] has been engineered with sufficient capability and capacity to prevent additional red mud releases or other unauthorized discharges into the environment</u> based on the quantities, characteristic and configuration of the red mud piles, local historical rainfall/runoff data and expected storm runoff at the facility. **PEx 10**.   (Emphasis added)

Thus, under the PSA, because DPNR ordered it, Alcoa was *contractually* required to insure that there was a control system "engineered with sufficient capability and capacity to *prevent* additional red mud releases or other unauthorized discharges into the environment." Garver was asked by SCA to design such a system. **PEx 13**.  In June 2002, at Alcoa's request, Garver prepared a "Bauxite Residue Disposal Area Reclamation" report containing: a Survey Control Plan, Existing Site Plan, Proposed Site Plan, Differential Contours, Finished Ground Elevations and Grid Volumes **PEx 14**.  On or about September 23, 2002,

Garver provided an initial draft of its proposed plan. **PEx 13**. During this time Garver submitted ordinary invoices for ordinary engineering work. *See* invoices, *infra*.

In November 2002, Garver Engineers issued detailed topographic maps of the project. **PEx 15**. In November of 2002, Garver Engineers also prepared a full report titled *Bauxite Residue Disposal Area Reclamation* for Alcoa. The specifications covered the following subjects: Clearing and Grubbing, Earthwork, Pipe, Erosion Control, Seeding, and Topsoiling. **PEx 16**.

In January 2003, there was another major discharge event.

A. Plaintiff asserts that Alcoa knew of this major discharge event--and had extensive equipment and manpower on the site for two weeks trying to avoid disclosure and dispose of evidence -- because Alcoa was seeking to obtain an DPNR consent agreement in the next two weeks that would have reduced its liability.

B. Defendants assert only that "St. Croix Alumina is aware that DPNR has alleged that on or about January 9, 2003" there was such a release. **PEx 17** at 9-10.

On January 22, 2003, with DPNR uninformed about the discharge event, SCA obtained a *Consent Order and Stipulation of Dismissal with Prejudice* from DPNR. Renaissance was not a signatory to this Consent Order, nor was informed of the discharge, the negotiations or the content of the order prior to its execution. Alcoa agreed to the following actions:

3. As soon as practicable, SCA [Alcoa] will submit a coastal zone permit application based upon the proposal developed by Garver Engineers, LLC for the redesign of the red mud sediment control system, which is designed to prevent or minimize future releases to the environment, if any, from the red mud piles located on the facility formerly owned by SCA (the 'Garver proposal'), and SCA shall simultaneously submit a copy of the Garver Proposal to DPNR-DEP, which shall use its best efforts to assist in the expeditious consideration of the permit application and issuance of the coastal zone permit (the 'Permit') and SCA shall use best efforts to obtain the Permit;

4. Within seven (7) business days of issuance of the Permit, SCA shall commence the work in accordance with the Permit, provided however that SCA shall not be deemed to be in breach of this paragraph in the event of any delays attributable to any actions or omissions of the St. Croix Renaissance Group, LLC, the current owner of the facility.
* * * *
6. Except as stated herein, SCA shall have no further obligations to DPNR-DEP arising out of or related to the June 18 Order, which shall be and hereby is DISMISSED WITH PREJUDICE, and DPNR-DEP shall not initiate or pursue any additional

enforcement actions against SCA including but not limited to administrative, civil or criminal actions related to the discharge of red mud into the environment which is the subject of the June 18 Order, provided, however, that nothing herein shall prevent DPNR-DEP from taking appropriate enforcement action with respect to any violations committed by SCA with respect to construction activities undertaken pursuant to the Garver Proposal, or in the event that SCA fails to comply with any deadlines set forth in paragraphs 1-2 of this Consent Order. **PEx 18.**

DPNR learned soon thereafter that there had been a significant additional release during January 2002 -- and that Alcoa and its contractors had worked without a permit or disclosure.  On February 11, 2003, "DPNR inspected the west ditch" (**PEx 19**) finding that SCA failed to inform DPNR of another discharge until after the consent order was obtained.[5]

In February 2003, Garver Engineering prepared grading topos for Alcoa containing: an Existing Site Plan, a Grading Plan, Grading Differential Contours and Grading Grid Volumes **PEx 20**.  Also in February 2003, Garver prepared a *Bauxite Residue Disposal Area Stormwater Collection Plan*.  It contained equally technical attachments. **PEx 21**.

Pursuant to requirements in the January 22, 2003 *Consent Order,* on March 12, 2003, Alcoa and SCRG jointly applied for an "Earth Change/Coastal Zone Permit." The so-called 'Garver Plan' was attached -- and submitted to DPNR. **PEx 22**.  The next day, DPNR's director sent a letter to Alcoa regarding the January 9th release. **PEx 23.**

> On January 31, 2003 and February 11, 2003, personnel from DPNR-DEP inspected the site. Their observations were as follows:
> * * * *
> As of March 7, 2003, the West Ditch was completely full of red-mud laden water.
> In the past, SCA/Alcoa has assured DPNR-DEP that the containment system would control the flow of red mud into the ditch. It is clear from these observations that the Pond is not functioning as intended. Id.

Due to that release, DPNR-DEP ordered the following actions from SCA:

> Contact DPNR-DEP upon receipt of this letter within 48 hours.
> Commence daily inspection of the temporary sediment control system.

---

[5] As will be discussed, *infra*, DPNR subsequently determined that this order was improperly obtained by Alcoa's failure to inform DPNR of the January 9, 2003 discharge event.

Submit monthly reports on the inspections or any activities at the West Ditch area.

Design and provide proposed measures to DPNR-DRP to provide rapid repair to any breech of the temporary sediment control system.

Create and implement a monitoring/emergency response plan for the temporary sediment control system. The plan should be submitted to DPNR within seven (7) calendar days of this letter.

Identify and report to DPNR-DEP the person(s) responsible for monitoring and maintenance of the temporary sediment control plan.

Investigate the high pH conditions at the West Ditch area and submit a report on SCA/Alcoa's findings within 30 days of this letter.

<u>Develop and implement a plan to eliminate the discharge of high pH liquids into the waters of the Virgin Islands as per USVI regulations with thirty days of this letter</u>.

Contact DPNR-DEP prior to any investigator/repair work at the West Ditch area.

Any discharge in violation of Virgin Islands Water Pollution Law must be reported immediately to DPNR-DEP. <u>Id</u>. at 2-3 (Emphasis added).

So now the DPNR's order was to "[d]evelop and implement a plan to *eliminate the discharge of high pH liquids into the waters of the Virgin Islands.*" Despite this order and the PSA provisions making that order part of Alcoa's contractual duties, on March 19th, Alcoa's counsel sent a letter to SCRG, requesting indemnification for the January 9, 2003 discharge of red mud. **PEx 24**. On the same day, March 19, 2003, Alcoa's counsel sent the letter to SCRG, she also sent a letter to the DPNR director denying any responsibility for the January 9, 2003 discharge event. **PEx 25**.

In April there was yet another significant discharge event. After that occurred, on April 29, 2003, the DPNR issued an administrative order to Alcoa and SCRG under *Title 12 V.I.C. Section 188(d) of the Water Pollution Control Act.* Alcoa then asked Garver to develop an updated plan. In June 2003, Garver Engineers prepared a *Bauxite Residue Area Stormwater Collection Plan* for Alcoa. **PEx 26**. Through all times mentioned above, Garver sent invoices which reflected nothing more than the ordinary engineering planning, meetings and the development work described. For example, on October 7, 2003, Garver

Case: 1:04-cv-00067-HB   Document #: 228   Filed: 06/19/09   Page 13 of 22
SCRG's Memorandum re Garver Documents
Page 12

Engineers sent one of many routine invoices to Alcoa for professional services plans during the time period from August 16-September 12, 2003 in the amount of $5,019.07. **PEx 27**.

### C. Garver as the Certifying Entity to CZM and DPNR

On September 11, 2003, Eric Black and Garver's Marvin Dalla Rosa testified before the Coastal Zone Management Commission regarding how the technical details of the "Garver Plan" would form the basis of CZM permit CZX-15-03(L).   Soon thereafter, on October 27, 2003, Alcoa's Larry Grace sent an email to SCRG's Jack Thomas responding to Thomas' October 25th questions about Alcoa's position on Garver's role with regard to becoming the certifying entity for compliance -- what Grace referred to as the "referee".

> Jack Thomas: We ask you to reconsider the use of Justin Blakely as the oversight and acceptance engineer for the project. I understand that Amy Dempsey holds Justin in high regard. . . . **PEx 28.**

> Larry Grace:   Based on the pre-existence of a professional relationship between Antilles Engineering and SCRG, SCA is not agreeable to engaging Antilles **as a referee** to confirm completion of the project. Alternatively, we propose that: a) Upon completion, Garver certifies to the agency that the work has been completed. . . .**PEx 29. (Emphasis added)**

Although SCRG objected to Garver assuming this new 'referee' role, Alcoa pressed the point and DPNR agreed to allow Garver to act as both the oversight and certifying entity. On October 30, 2003 a hearing was held by the CZM regarding the permit application. **PEx 30**.   During the hearing Alcoa's counsel, Simon Francis, Esq., represented the following about Garver's role to the Commission:

> MS. FRANCIS: Can we just also add for the Committee's benefit what SCA had intended to do as part, of this work. the engineers who done the design, Garver Engineers, they will be on site periodically during this process, and prepared to certify at the completion of the process, which is our understanding to be the requirements of the act that the work was done in accordance with those specifications, and to do that. within a time certain after the work is complete, And we would propose that serve as certification to the Committee that the work has completed in accordance with the requirements of the permit. Id. at 8.

She emphasized that only Garver should be the engineers to certify the completion.

MS. FRANCIS:        . . . we would propose that in terms of the conditions of the permit that certainly what has been discussed should be the formal condition, which is that the engineers who designed this work will certify to Director Williams that -- I'm sorry, Mr. Williams, soon to Director Williams, that. it has been done in accordance with the plans and certifications . . . Id. at 10.

As a result, on November 5th, the Permit was granted, containing the provision for Garver's

certification. **PEx 31**.  On November 7, 2003, Alcoa issued a purchase order to Garver for:

professional engineering consultants on periodic basis to evaluate the construction work related to the storm water project approved drawings and technical specifications.  The consultant will inspect the construction work in a time frame and manner which will produce a document at the conclusion to the work certifying that the project construction complies with specifications and technical aspects related to the work.  Consultant will provide any findings made during the course of each site visit to ensure compliance with specifications. **PEx 32**.

Garver supervised the onsite monitor and provided him with notebooks in which he would

keep a daily diary necessary for certification.  It contained a great deal of detail:

We provided Eric with a notebook containing section dividers for each pay item and an example of how each is calculated and sections for field testing, a field book to use as a daily diary documenting the work, and a 3-1/2" diskette with a weekly report form. We discussed that Eric would need to keep track of all quantities as outlined in the notebook. This documentation in the project notebook will be important for tracking progress and contractor payment. **PEx 33.**

The instructions also dealt with his recording of materials testing and submittal lists:

We also discussed the procedures for documenting materials testing and how they should be kept in the project notebook. Examples of testing results/forms were provided to Eric as well as forms for documenting tests. We will need proctors on each different material used and at an interval of 1,000 cubic yards for each material. We also discussed that tests must be numbered in such a way to match them up with the result forms from the lab and how to document failed tests. Before the site visit we mailed Eric a submittal list and we discussed the list, what we expected from the contractor, and that copies of the reviewed submittals should be kept in the project notebook. Id.

And it was clear that the photos, progress reports, weather conditions, items of work and

other reportage would be "necessary for [Garver] to satisfactorily certify the project".

We also discussed the weekly progress reports. Eric was asked to provide us with a completed weekly report form via e-mail with copies of his daily diary for the week attached and any photos take of construction. We informed Eric that his

diary should include such things as weather conditions, items of work, problems or changes associated with the work, and any other notes that were relevant to construction. We expressed the need that complete documentation in the project notebook, daily diary, and weekly reports will be necessary for us to satisfactorily certify the project. Id.

**At no time prior to, during or after the hearing, or in setting up the oversight and certification documentation, did Garver inform DPNR, CZM, or SCRG that it was allegedly a secret litigation consultant, that Garver was covertly part of Alcoa litigation team, or that Garver would allegedly be wearing two hats and thus making all certification analyses and decisions under claims of privilege based on some agency theory. Nor did Alcoa or its counsel disclose this alleged agency or attorney client relationship.**

The described notebooks are one of the points of contention in this action. One document, nothing even close to what was described, has been produced -- and, as discussed in more detail below, DPNR has alleged that the certification is "invalid" and possibly "perjurious". Although it strains credibility, as the record stands now, at the very least, there appears to have been little supporting, truly detailed data from the field.

On March 9, 2004, Eric Black sent an internal email to Alcoa engineers Dave Ritchey and Bob Horger reflecting that Alcoa's relationship with Garver was now one of a certifying entity reviewing compliance:

As you are both probably aware, the proposal for SCA constructing a containment berm on the residue area has been taken off the table by SCA. Nonetheless, as you are no doubt also aware, the current design of the project has several holes as well as complications due to design and residue factors. . . .

Finally, at this point I am not sure that we have a true handle on project cost. In any case, it might be a good idea to get Dick (or whomever can help put) to return to St. Croix in the very near term to help resolve some of these design concepts. Upon resolution I would then ask that he help run these designs by Garver (whom we apparently will still need to certify the project on completion). Alternatively, I could have Garver make one of their required trips to the project while Dick was still onsite so that he could walk them through the changes or simply use Garver

for the work. <u>I don't feel however that using Garver for the design aspects would result in cost effective or timely solutions</u>. **PEx 34**. (Emphasis added).

On April 7, 2004, Eric Black sent an email regarding Garver's response to SCA's proposed changes to the engineering work in which he discussed removing Garver as Garver felt the proposed work would "not be sufficient to withstand the runoff."

I have just received a response from Garver Engineering regarding my inquiries about the review of additional SCA engineering work and the incorporation of this work into preliminary drawings for possible CZM review.

At this point, <u>Garver is uncomfortable with the proposed work. Starting with the proposed slope berm, it is their current opinion that such a berm would not be sufficient to withstand the runoff coming across the west residue area</u>. Although I explained that the contours they are working from are apparently inaccurate and the runoff actually flows toward the middle of the area, they are unconvinced and have requested that the entire area be surveyed and revised contours made. Because they believe that water would move over the proposed berm, they cannot revise the west access road ditch design or evaluate the proposed catchment. Additionally, they also indicated that although they could process this work after receiving the revised contours and calculating runoff and other engineering parameters, the current contract that we have in place would possibly be exceeded.

If we determine that we will proceed with additional surveying and rely on Garver to work up this data, the time frame for drawings will be moved back at least several weeks. Positives would be that Garver would continue in its role of certifying the project at completion.

<u>**If we determine to remove Garver from the process, we could proceed much more quickly**</u> <u>(assuming RFA funding approval is received) but would lose the Garver certification of the project at its conclusion.</u>

In either case, it seems to me that <u>**Garver realizes that they essentially have us over a barrel on this**</u>. <u>Should we continue to use them</u> <u>**we will need to insure that we minimize their design and engineering role to a minimum**</u>, providing to them justified and fully engineered changes that they will find difficult to question. I think we have done this reasonably well already but the question of current contours has triggered their response. **PEx 35**. (Emphasis added).

This hardly sounds like a confidential attorney-client relationship with "litigation team" members. Rather, it sounds like what it was -- **Garver was clearly understood by Alcoa as primarily reporting to the regulator, DPNR, and hostile to such requests by Alcoa.**

Case: 1:04-cv-00067-HB   Document #: 228   Filed: 06/19/09   Page 17 of 22
SCRG's Memorandum re Garver Documents
Page 16

There is additional evidence of the non-privileged relationship at this time.  Alcoa and

Garver again formalized the arrangement by contract in February of 2005, executing

another in a series of "Engineering Service Contract[s]".  In Section I. the contract recited,

> SECTION I. STATEMENT OF WORK
> Seller shall furnish professional engineering services, provide supervision, labor,
> materials, tools, equipment, and other things necessary to conduct civil surveys
> and evaluate construction services performed by third parties on behalf of the
> Company related to the storm water project at the St. Croix Renaissance Group
> property located in St. Croix, US VI. (the "Work").
>
> Seller shall provide a written report certifying that the project construction complies
> with approved drawings and technical specifications. **PEx 36**.

Section VII recites that, "[t]he Contract, together with the attachments hereto, constitutes the

**entire agreement between Seller and Company**. . . ." (Emphasis added). Id.   That

contract was also executed by Marvin Dalla Rosa for Garver.

Garver eventually did certify the project as complete -- although DPNR maintains that

this was a false certification -- and as the letter quoted above reflects, may have been done

under pressure of removal or reduced work from Alcoa.  However, at the same time Alcoa

was pressing Garver to certify, Alcoa's internal senior engineer described the project as a

shambles and poorly executed -- and the plan's design as "flawed".  On February 22, 2004,

Alcoa Engineer Dave Ritchey sent the results of his internal Alcoa audit.  Ritchey stated:

> Issues That Must be Addressed
> As you are aware I visited St Croix this past week accompanied by Bob Horger of
> the Alcoa environmental group and a specialist on underground services and
> hydrology studies of rain water, run off issues, etc. and Dr. R. Van Tassel, a retired
> Alcoa, geotech expert with long experience of working with bauxite residue. Our
> charge was to determine if the current request for a revised RFA should be
> approved and what could be recommended to get the continuing escalating costs
> of this project under control. The following is our report of that project audit.
> * * * *
> 1. Garvers original design to slope the residue pile without providing for run-off
> control is the root cause of the current erosion condition. The result of unchecked
> erosion can be seen in the West gully over the sanitary sewer.

Case: 1:04-cv-00067-HB  Document #: 228  Filed: 06/19/09  Page 18 of 22
SCRG's Memorandum re Garver Documents
Page 17

2. SCRG has not and may never re-slope the unchecked slopes and place vegetation on them. We have no control over SCRG in this regard and the St. Croix government also has had no success with pressuring them.

3. The original Garver design allows for all rain run off on the top of the entire residue area to flow down the side slopes in the South West corner. This design is flawed. Even some areas with vegetation has eroded. The periphery around the top of the residue area must be diked to keep water from coming down the slopes. These dikes could be built from the residue 2'-0 to 3'-0 high and 8'-0 across with some soils added to the dikes top surface to act as a binder. **PEx 37.** (Emphasis.)

Though Alcoa denied externally what its own senior engineer was saying internally (blaming Garver) on August 10, 2006, DPNR sent a letter to Alcoa, responding to Alcoa's contention that the work at the red mud pile, pursuant to the CZM permit, was complete. It summarizes the same failures and evasions by Alcoa that were documented by its own internal senior engineers -- and added that Garver's certification might well be perjurious:

the certification provided by Garver that the work complied with the specifications and plans was executed by Garver with a conscious understanding that the final work was inconsistent with the plans and specifications. Accordingly, the certification is invalid, possibly subjecting the certifying individual to charges of perjury. **PEx 38.** (Emphasis added).

SCA failed to comply with its obligations, and the permit application was also misleading:

With regard to the Agreed Order, SCA has failed to comply with its obligations. Specifically, SCA obtained its CZM permit based upon certain information it provided in its permitted drawings. According to General Condition 6(e) of SCA's CZM permit. . . .As you know, Garver Engineers' ('Garver's') as-built survey is inconsistent with the permitted drawings SCA submitted with its application. After reviewing Garver's May 18, 2006 letter to Eric Black, it is apparent that much of the factual information upon which the permit application was premised was highly inaccurate (and perhaps false). Apparently, Garver's review of the site in advance of submitting SCA's application was woefully inadequate, resulting in Garver not knowing the actual conditions in the field until Garver was attempting to implement its plan.(5) Id. (Emphasis added)

DPNR advised Alcoa, via letter, dated March 17, that the 'Division of CZM has determined that [SCA] had *not* complied with the Garver Plan.'

Even as these inaccuracies were discovered, however, neither this Department nor the St. Croix Committee of the Virgin Islands CZM Commission was advised of these inaccuracies. Instead, SCA in conjunction with Garver acted without any regard for the law and proceeded to modify the plan without any consent from

> DPNR or the Committee. Because of the inaccuracies presented in SCA's permit application as compared to the as-built survey, I advised you via letter, dated March 17, that the 'Division of CZM has determined that [SCA] has **not** complied with the Garver Plan.' (bold emphasis in original). Explanations provided after the fact do not put SCA into compliance with its CZM permit or the Plan. . . . Id. (Emphasis added).

Furthermore, the certification was invalid:

> Also, based upon all of these inconsistencies between the as-built survey and the permitted drawings, it appears that the 'certification of compliance provided by [Garver] that the plans and specifications of the project and all applicable Virgin Islands Code requirements have been met,' as required by General Condition 6(g) of SCA's CZM permit, is invalid. Id. (Emphasis added).

Garver knew that its assertion of compliance was wrong:

> Clearly, SCA and Garver made a conscious decision to stray from the permit requirements and plan. SCA and Garver continue to be under the misconception that SCA was not required to 'contain the bauxite residue but [only] to divert sediment-laden storm water from the bauxite residue stockpile....(6) Inherent in the terms of the Agreed Order was an understanding that the proposed system would be effective at preventing or minimizing future releases to the environment. DPNR always anticipated that SCA's agreed work pursuant to the Agreed Order would serve this purpose. The language of the Agreed Order couldn't be clearer in this regard. To the extent SCA misunderstood its obligations and thought it could meet its obligations under the Agreed Order by constructing an ineffective system that depends upon additional work by St. Croix Renaissance Group ("SCRG"), SCA did so at its own peril. . . .SCA's continued reliance on SCRG's failure to vegetate the red mud piles as the basis for the Garver system not preventing red mud releases to the environment is misplaced.  Id.

Finally, DPNR found that Alcoa's and Garver's contention that Alcoa had complied with the

Administrative Order indicated a "complete lack of credibility" and was "laughable":

> THE APRIL 29. 2003 ADMINISTRATIVE ORDER
> DPNR finds your assertion that SCA has now complied with the April Order to be laughable. This assertion indicates a complete lack of credibility on the part of SCA. To the extent SCA and Alcoa always believed that SCA's obligations under the April Order could be met by simply completing the Garver plan, which it had already agreed to complete pursuant to the Agreed Order, why did SCA and Alcoa spend substantial sums for their counsel to prepare extensive briefs opposing DPNR's authority to issue the April Order? Obviously, SCA and Alcoa recognized that the April Order contained substantially more specific requirements than those set forth in the Agreed Order and understood that the burden of implementing those specific requirements would be substantially greater and more costly.
> At this time, SCA and Alcoa have been out of compliance with the April Order for over three years. The administrative penalties for such non-compliance are

Case: 1:04-cv-00067-HB   Document #: 228   Filed: 06/19/09   Page 20 of 22
SCRG's Memorandum re Garver Documents
Page 19

substantial. As you acknowledge implicitly through your reference to the April Order in your June 28 letter, SCA and Alcoa continue to have an obligation to comply with the April Order. Id.

With this history in mind, it is appropriate to apply the applicable law to these facts.

## IV. Argument

It is axiomatic that when a party voluntarily includes a third party in a communication, or discloses a communication to a third party, any claim of attorney-client privilege for that communication is waived.

> A communication is only privileged if it is made "in confidence." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68. In other words, if persons other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the privilege does not attach. The disclosure rule operates as a corollary to this principle: if a client subsequently shares a privileged communication with a third party, then it is no longer confidential, and the privilege ceases to protect it. See DEL. R. EVID. 510. This is because the act of disclosing signals that the client does not intend to keep the communication secret. RICE § 9:28. In addition, it prevents clients from engaging in strategic selective disclosure. United States v. Bernard, 877 F.2d 1463, 1465 (10th Cir. 1989). The privilege does, after all, hinder the truth-seeking process, and so we carefully police its use. United States v. Doe, 429 F.3d 450, 453 (3d Cir. 2005).
> Disclosing a communication to a third party unquestionably waives the privilege.

*Teleglobe Communs. Corp. v. BCE, Inc. (In re Teleglobe Communs. Corp.)*, 493 F.3d 345, 361 (3d Cir. 2007); *see also Addie v. Kjaer*, 2008 U.S. Dist. LEXIS 107548, 7-8 (D.V.I. 2008) where the court held:

> The attorney-client privilege is also waived when a client voluntarily discloses privileged communications to a third party. Westinghouse Electric Corporation v. Republic of the Philippines, 951 F.2d 1414, 1424 (3d Cir. 1991)(citing United States v. Rockwell International, 897 F.2d 1255, 1265 (3d Cir. 1990)). Restatement of Law, Third, The Law Governing Lawyers, § 79 (2000). <u>The voluntary disclosure by a client of a privileged communication waives the privilege as to other such communications relating to the same subject matter made both prior to and after the occurrence of the waiver.</u>  (Emphasis added.)

This rule is also true for the work product privilege[6].  *See e.g. In re Grand Jury (Impounded)*, 138 F.3d 978, 981 (3d Cir. 1998)("a party may waive the attorney work product privilege by disclosing protected documents in certain circumstances.")

In summary, to the extent a privilege may have otherwise existed, when documents were sent to Garver (or when sent by Garver), any privilege was waived.  Garver testified that: (1) it had never been hired as part of a litigation team, (2) it never understood there to be any expression of an expectation of confidentiality (other than an unexplained legend on some copied correspondence that Garver never understood), (3) there was nothing written into any contract, nor was there any contract that expressed such a special relationship or expectation.  As it progressed, the relationship was functional, then became supervisory, and was finally combative, as Alcoa wanted to get rid of them as the certifying entity, but was "over a barrel".  Moreover, no alleged attorney client relationship was ever disclosed to DPNR or SCRG in discussing Garver's ability to be the impartial referee.  Indeed, such a covert "privilege" would not only have been inconsistent with what Alcoa testified to obtain that position for Garver--but would also be contrary to *DPNR's  absolute right to see all communications supporting the certification*.  In short, Alcoa has no factual basis to assert a privilege over communications between its counsel and Garver in this case.

---

[6]  The application of the work product privilege to agents has been acknowledged.

The work-product doctrine, first recognized by the Supreme Court in Hickman v. Taylor, 329 U.S.495, 67 S.Ct. 385, 91 L. Ed. 451 (1947), "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." . . . . "This protection also can extend to materials prepared by an attorney's agent, if that agent acts at the attorney's direction in creating such documents." Id. (citing Nobles, 422 U.S. at 238-39, 95 S.Ct. at 2170).

*Times of Trenton Publ'g Corp. v. Pub. Util. Serv. Corp.*, 2005 U.S. Dist. LEXIS 34624, 10-11 (D.N.J. May 3, 2005).

Case: 1:04-cv-00067-HB   Document #: 228   Filed: 06/19/09   Page 22 of 22
SCRG's Memorandum re Garver Documents
Page 21

**Dated:**  June 19, 2008

*/s/Joel H. Holt*
Joel H. Holt
2132 Company Street
Christiansted, St. Croix
USVI, 00820
Telephone: (340) 773-8709
Facsimile: (340) 773-8677

Carl J. Hartmann, III
5000 Estate Coakley Bay, L-6
Christiansted, VI 00820
Telephone: (340) 719-8941

### CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of June, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Simone R.D. Francis
The Tunick Building
1336 Beltjen Road, Suite 201
St. Thomas, Virgin Islands 00802

Charles A. Gall, Esq.
Hunton & Williams LLP
Fountain Place
1445 Ross Avenue, Suite 3700
Dallas, TX  75202-2799

Cassandra C. Collins, Esq.
William H. Wright, Jr., Esq.
Hutton & Williams
951 E. Bryd Street
Richmond, VA  23219

*s/Joel H. Holt*