IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| ST. CROIX RENAISSANCE GROUP, | : | CIVIL ACTION |
| LLLP, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| ST. CROIX ALUMINA, LLC, et al. | : | NO. 04-067 |

MEMORANDUM

Bartle, C.J.                                    December 23, 2009

          Defendants St. Croix Alumina, LLC ("SCA") and Alcoa
World Alumina, LLC ("Alcoa") have moved for summary judgment
against plaintiffs St. Croix Renaissance Group, LLLP ("SCRG"),
Brownfield Energy Recovery Corporation, and Energy Answers
Corporation of Puerto Rico, pursuant to Rule 56 of the Federal
Rules of Civil Procedure.[1]

          This dispute arises out of the sale by defendants to
SGRG of defendants' large industrial site containing an alumina
refinery on St. Croix (the "Property").  In their Second Amended
Complaint, SCRG brings claims for fraud in the inducement (count
1), breach of contract (count 2), and negligence (count 3).[2]

_____

1.  Brownfield Energy Recovery Corporation and Energy Answers
Corporation of Puerto Rico are the parent corporations of SCRG,
which was incorporated solely for the purpose of purchasing the
Property in issue.  As discussed below, it appears that they have
assigned their rights in this dispute to SCRG.  Unless otherwise
noted, we shall refer to plaintiffs collectively as SCRG.

2.  The Second Amended Complaint also contained claims for fraud
in the performance (count 4) and punitive damages (count 5).
SCRG has now withdrawn these counts.

I.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). At this stage, the court makes all reasonable inferences from the evidence in the light most favorable to the non-movant. In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

II.

The following facts are either undisputed or viewed in the light most favorable to SCRG.

In 1995, defendants purchased the Property from then-owner Vialco and continued to operate it as an alumina refinery from 1998 until December 2000. The alumina plant at the Property was designed to extract alumina from bauxite ore using the Bayer process, which involved: (1) crushing and grinding bauxite ore; (2) dissolution of alumina hydrates with a caustic soda at high temperatures and pressures; (3) removing impurities via separation and clarification; and (4) calcination and precipitation of alumina. This process, by its nature, creates a high-pH waste product referred to as red mud. While defendants

-2-

operated the Refinery, they disposed of the red mud at a site referred to as "the current red mud disposal area," which is located northwest of the Refinery. Vialco also used this site for the same purpose when it operated the plant. Previous operators used an area known as "the old red mud disposal area," which is immediately west of the Alucroix ship channel.

In 2001, SCRG signed a letter of intent to purchase the Property in its "as is" condition and to assume "on-going environmental liability and risk, including all remaining remediation and groundwater monitoring responsibilities" for the conditions at the Property except for the items that were specifically identified in the letter to be retained liabilities of defendants. The letter provided that SCRG would assume liability for the red mud disposal areas. After signing the letter of intent, SCRG continued to conduct additional due diligence, including inspection by a team hired to perform an analysis and review of environmental concerns on the Property. Defendants allowed SCRG opportunities to inspect the Property and supplied SCRG with their records and two environmental studies: (1) an environmental due diligence assessment conducted by the firm Arthur D. Little, Inc. (the "Little Report") in August 2001, and (2) an environmental site assessment conducted by Geraghty & Miller, Inc. in June 1995 (the "G&M Report"). SCRG was also given defendants' grading plan for the Property, which was prepared by Garver Engineering.

On March 22, 2002, plaintiffs Brownfield Recovery Corp. and Energy Answers Corporation of Puerto Rico entered into a Purchase Sale Agreement ("PSA") with defendants. The PSA contained provisions about the sale and transfer of the Property, including defendants' warranties about the condition of the Property and apportionment of liabilities from any continuing environmental problems. Specifically, under § 6.1 of the PSA, SCRG agreed to purchase the Property in "as is, where is" condition, "with all faults." Defendants disclaimed all representations, guarantees or warranties except for three express warranties contained in § 8.1 and reiterated in their closing certificate.

Under § 6.2, defendants retained liability for removing any equipment on the Property that contained PCBs, for stabilizing any material on the Property containing asbestos, and for completing remediation of subsurface oil contamination in accordance with a DPNR order. Defendants also retained responsibility for red mud or bauxite releases during Hurricane Georges, as well as any liability resulting from a November 15, 2001 release of sulfuric acid. SCRG agreed to defend, indemnify, and hold harmless SCA for any other liabilities other than those outlined in § 6.2.

Section 8.1 details the three express warranties that defendants made to SCRG. The first warranty, contained in § 8.1.4, provides:

> To Seller's knowledge, there are no hazardous
> materials on the Property which violate any
> current applicable Federal, state or local
> environmental laws or regulations, except as
> disclosed in Exhibit 8.1.4 attached hereto
> and made a part hereof, or in the
> Environmental Reports.

The second warranty, found in § 8.1.6, reads:

> Except as disclosed on Exhibit 8.1.6,
> attached hereto and made a part hereof, or in
> the Environmental Reports, Seller has
> received no written notice of any pending
> violation or alleged violation of any
> federal, state or local statute, law, rule,
> regulation, ordinance, code, policy or rule
> of common law in effect, and any judicial or
> administrative interpretation thereof,
> including, any judicial or administrative
> order, consent decree or judgment relating to
> the environment, health, safety or hazardous
> materials, including [federal laws recited]
> and their state and local counterparts and
> equivalents (the "Environmental Law")
> affecting the property...

The third warranty, also found in § 8.1.6, provides:

> ... and to Seller's knowledge, there are no
> such violations outstanding of the
> Environmental Law, except as disclosed on
> Exhibit 8.1.6 attached hereto and made part
> hereof, or in the Environmental Reports.

Under § 8.4 of the PSA, "[n]o party making a claim under any
breach of a representation or warranty may recover any losses in
excess of $3,000,000.00."

Exhibit 8.1.6 is a "schedule of violations" of
environmental law on the Property.  It lists:  (1) the Little
Report; (2) litigation brought by Senator Alicia Hansen in the
U.S. District Court for the District of the Virgin Islands, Civ.
A. No. 99-36; (3) a Notice of Violation from DPNR dated

October 21, 1998; (4) and Order from DPNR dated November 21,
2001; (5) a Supplemental Order from DPNR dated December 4, 2001;
(6) a second Supplemental Order from DPNR dated December 17,
2001; (7) a letter from DPNR dated January 28, 2002; (8) a
Nuclear Regulatory Commission Inspection Report and Notice of
Violation dated December 28, 2001; (9) opacity violations of coal
powerhouse emission limitations from January 1998 to June 1998
and from April 1999 to April 2000; and (10) a letter from the
U.S. Environmental Protection Agency dated December 6, 2001.

The parties set forth in § 19 of the PSA that the
"Agreement shall be construed under the laws of the State of
Delaware, excluding those related to conflicts or choice of law."

Subsequent to the signing of the PSA, but prior to
closing, SCRG discovered that there had been a "discharge event"
from the current red mud disposal area into the Caribbean Sea.
DPNR investigators also issued a Supplemental Order on April 18,
2002 after finding a fracture in the wall of the Alucroix Channel
which potentially allowed elevated-pH seeps into the groundwater
east of the old red mud disposal area.  As a result of these
incidents, the parties amended the PSA by letter dated June 13,
2002 (the "Letter Amendment").  That letter recorded the
defendants' renegotiated "Retained Liabilities" applicable to the
sulfuric acid and red mud releases outlined in § 6.2(e) and
required defendants to continue post-closing remediation of
certain areas of the Property to the satisfaction of DPNR.

The transaction closed on June 14, 2002.  As part of
the closing, defendants expressly restated and renewed each of
the three original warranties contained in the PSA.  On this
date, SCRG assumed all the rights and obligations of the PSA held
by the other plaintiffs.

III.

We first turn to defendants' motion for summary
judgment on SCRG's breach of contract claim.

SCRG alleges that defendants have breached the
warranties contained in § 8.1 of the PSA.  The four distinct
breaches of the warranty asserted are:  (1) failure to disclose
multiple red mud discharge events; (2) failure to alert
plaintiffs of a written report by DPNR of the elevated pH
groundwater in the Alucroix channel; (3) failure to disclose
ongoing violations of the environmental permit required for the
contractual remediation work; and (4) failure to alert plaintiffs
to hazardous materials on the Property.  SCRG also alleges that
defendants breached their contractual duty in failing to complete
all corrective action required by DPNR in § 6.2(e) of the PSA, as
amended by the letter agreement dated June 13, 2002.

The warranties require defendants to disclose all
"hazardous materials on the Property," of which they have
knowledge; all "written notice[s] of any pending violation or
alleged violation ... of Environmental Law;" and any "such
violations outstanding ... of the Environmental Law," of which
they have knowledge.  We must first review the record and

-7-

determine if there is evidence of any violations that fall within
the scope of the warranties and, if so, whether there is evidence
that defendants had knowledge or had received a written notice
about them.

Prior to closing, defendants informed SCRG about a
single release of red mud, which had become the subject of an
inquiry by the Department of Planning and Natural Resources
("DPNR").  SCRG alleges that a pattern of multiple releases
occurred as recently as April 2002, of which defendants were well
aware and which they knowingly concealed from SCRG in violation
of the warranties in the PSA.

SCRG puts forth abundant evidence to show the existence
of red mud spills at the Property in April 2002 and the months
prior.  First, there is an April 17, 2002 email informing Alcoa
that SCRG officials found red mud in a drainage ditch outside of
the current red mud area.  SCRG has also produced an email from
Joe Norton, Alcoa's Environmental Health & Safety Manager, to
Larry Grace of Alcoa, recounting the findings of Garver
Engineers, an environmental consulting firm hired by Alcoa.
Garver Engineers, according to this letter, stated that the
"spill" was not a "one-time event."  In addition, the record
contains an administrative order from DPNR dated June 18, 2002,
regarding the "illegal discharge" of "thousands of cubic yards of
red mud" from what appeared to be "multiple spills" occurring
prior to April 2002.  In sum, SCRG has come forward with evidence

that defendants knew about and failed to disclose the releases of red mud.

Defendants do not challenge SCRG's contention that these red mud releases took place and that these releases are violations of the Environmental Law. Nor do they dispute that these spills were known and not disclosed to SCRG in Exhibit 8.1.6 or the Environmental Reports. Instead, defendants maintain that any violation is outside the scope of the PSA warranties.

Defendants argue that the warranties in § 8.1.6 of the PSA are limited to "pending" or "alleged" violations of environmental law that are "outstanding" at the time of closing. The defendants maintain that the warranties do not cover "historical conditions on the Property." We disagree. If a violation has existed for many years, it may be considered to be historical, but it is also pending or outstanding if not resolved or remediated. Defendants also seems to argue that a pending violation means a "proceeding that has been commenced but not completed." The second warranty in § 8.1.6 is not limited to violations where proceedings had been initiated by some official action. The warranty clearly encompasses any existing violations of Environmental Law of which defendants have knowledge, whether or not any governmental agency has knowledge of it or has moved against any party.

We agree with SCRG that defendants were required to notify it not only about written notices of pending or alleged violations, but also about *all* violations of environmental law of

which defendants had knowledge and which were unremediated or unresolved at the time of closing, no matter how long such environmental violations may have existed.  Whether a governmental agency had instituted a proceeding is immaterial.

Under Delaware law, where the contractual language is clear, as it is here, we must give it its ordinary or common meaning.  See Northwestern Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 44 (Del. 1996).  The warranty clearly protects SCRG against any undisclosed written notice of violations of the Environmental Law received from a government agency and any outstanding, that is, unresolved or unremediated, violation of the Environmental Law of which the defendants had knowledge at the time of the closing and which defendants had not disclosed to SCRG.

Defendants also contend that the red mud releases are outside the scope of the warranties in the PSA because they constituted erosion, which is specifically excluded.  They assert that SCRG knew of the potential problem of erosion and assumed liability for it when they signed the PSA.  Defendants point to the Little Report and G&M Report, which state that red mud erosion would continue to be a problem at the Property.  The warranties in PSA § 8.1.6 cover only environmental problems not contained in these reports.

SCRG, however, characterize the April 2002 releases as "discharge events," or spills, and not as erosion.  It relies on the evidence already recounted, as well as on the October 2002

-10-

DPNR investigation that describes a multi-layered spill pattern not characteristic of erosion. Whether the April 2002 releases of red mud into the sea is erosion which is outside the warranty or is a series of discrete discharge events within the warranty is a factual question to be decided by a jury at trial.

Defendants argue that, even if an express warranty has been breached, they are still entitled to summary judgment. They maintain that under Delaware law SCRG must have reasonably relied on the warranty to take advantage of it but that SCRG did not do so because it had knowledge of the spills prior to closing.

Under Delaware law, it is "clear that in order for a defendant to be responsible for a breach of warranty, plaintiff must have known about the warranty and relied on it." Bleacher v. Bristol-Myers Co., 163 A.2d 526 (Del. Super. Ct. 1960); see also Kelly v. McKesson HBOC, Inc., 2002 Del. Super. LEXIS 39 (Del. Super. Ct. Jan. 17, 2002). Delaware's case law suggests that in a contract between two sophisticated parties, each party is entitled to rely on the bargained-for representations and warranties of the other. See Thomas v. Grise, 41 A. 883 (Del. Super. Ct. 1898); see also Craft v. Bariglio, 421 at 24 (Del. Ch. Mar. 1, 1984). However, in Omar Oil and Gas Co. v. Mackenzie Oil Co., the Supreme Court of Delaware explained that a

> buyer will not be prevented from availing
> himself of false representations of the
> seller, unless he makes an investigation of
> his own account and it is of such character
> as to fully acquit him with the essential
> facts. If the buyer made an investigation
> that was free and unhampered, and conditions

> were such that he *must have obtained the
> information he desired*, or the facts he seeks
> to know were *as obvious to him as to the
> seller*, and their means of knowledge were
> equal, he is presumed to have relied on his
> own investigation, and not on the
> representation.  128 A. 392, 396 (Del. 1926).

If SCRG has not had an opportunity to make a full investigation
or did not have access to facts that make the relevant
information obvious to it, it is allowed to rely on defendants'
contractual warranties.  If, on the other hand, SCRG is found to
have made an investigation which in fact revealed to it the true
character of the red mud releases or which made the facts obvious
or must have made them obvious, it would no longer be reasonable
for SCRG to rely on the PSA warranties.

Defendants assert that SCRG had adequate knowledge of
the risks of migration of red mud from the disposal area prior to
closing and knew that there had been multiple releases caused by
defendants.  They point to the deposition testimony of Patrick
Mahoney, the President of plaintiff Energy Answers Corporation of
Puerto Rico, that defendants' red mud grading "was not a
responsible grading plan, poorly prepared, and no longer a
containment [of the red mud in the disposal area]."  They also
rely on the April 30, 2002 email of Jack Thomas, the Vice
President of Development for SCRG and General Manager and owner
of plaintiff Brownfield Energy Recovery Corp.,  to Larry Grace,
President of Alcoa, in which Thomas refers to "several releases"
of red mud into the Caribbean Sea.

SCRG counters that Mahoney's testimony merely indicates a knowledge of the *potential* for red mud releases and not knowledge that multiple red mud releases had occurred prior to April 2002. Similarly, SCRG contends that Thomas's reference to "several releases" of red mud discusses only releases of red mud that occurred after the execution of the PSA and does not indicate any knowledge of red mud releases that occurred before signing. Whether SCRG's had actual knowledge of facts that violate the warranty with respect to the red mud or whether the facts were obvious or should have been obvious to it from its investigation is a factual question. There exist genuine issues as to the material facts underlying whether SCRG knew or should have known about the pre-execution releases. We will deny summary judgment as to the breach of warranty for the red mud releases.

SCRG alleges a further breach of warranty with respect to elevated-pH groundwater in the Alucroix Channel. Specifically, SCRG asserts that high-pH groundwater was migrating from the Property into the Alucroix Channel and that defendants failed to disclose a June 11, 2002 written report from DPNR documenting these new discharges that were per se violations.

Defendants admit that the elevated pH groundwater flowing into the Alucroix Channel was a violation of the Environmental Law as defined in § 8.1.6 of the PSA. Defendants, however, argue that they did disclose this violation to SCRG in

Exhibit 8.1.6 as required, thus excluding this violation from the warranty, and were not required to give additional details.

SCRG contends that it is not claiming that defendants breached the warranty by failing to disclose the violation itself. Instead, it asserts that defendants breached the warranty by failing to disclose two written notices of these alleged violations of Environmental Law: (1) a report of the May 28 and 30, 2002 inspection by Natural Resource Consultants, Inc. ("NRCI"), a DPNR-appointed environmental consultant; and (2) a June 11, 2002 DPNR report describing new alleged environmental violations for the high-pH seep.

SCRG has not produced the report from NCRI's May 28 and 30 inspection. It has merely produced the title page of the report, "Inspection of New Encrustations and Seeps Along the Western Shoreline Shelf," and an accompanying fax from B. Green of NCRI to Eric Black, SCA's Environmental, Health and Safety Manager. The fax explains that, "we have noticed more eruptions along the shoreline in recent days." The NCRI title page and fax produced do not themselves document any notice of an alleged environmental violation. For example, the title page does not explain what type of eruptions or seeps are being described. The meager evidence produced by SCRG is clearly insufficient to create a genuine issue of material fact. SCRG also has not produced the alleged June 11, 2002 DPNR report of the new environmental violations or any evidence of it. Accordingly, we will enter judgment in favor of defendants for any breach of

-14-

warranty based on the high-pH groundwater seepage into the
Alucroix Channel.

SCRG alleges as the third breach of warranty under
§ 8.1.6 the failure of defendants to disclose that they were in
violation of permitting requirements with respect to the
regrading of the red mud piles.  SCRG maintains that defendants
needed a Coastal Zone Management ("CZM") permit to do the
regrading.  They plead in the alternative that defendants either:
(1) regraded the piles without the necessary environmental
permit; or (2) committed three distinct violations of Vialco's
formerly obtained CZM permit that they were using.

Defendants argue that, even assuming that they breached
the warranty by failing to obtain a CZM permit, they cannot be
liable because SCRG did not rely on the warranty in this
instance.  As discussed at length above, under Delaware law, if
SCRG is found to have made an investigation which revealed to it
that defendants did not have a required permit or that they were
violating the CZM permit that they had, SCRG could no longer
reasonably rely on the PSA warranties.  Defendants contend that
the deposition of Jack Thomas establishes that SCRG knew prior to
closing that defendants did not have a CZM permit for the
regrading that defendants were doing just prior to the closing.
In Thomas's deposition, he admits that Eric Black, SCA's
Environmental, Health and Safety Manager, told him that
defendants had no permit for the regrading done in March or April
of 2002.  SCRG concedes that it knew defendants did not have

their own permit.  Thus, SCRG cannot prevail on its breach of
warranty claim that defendants failed to disclose that they
lacked a permit for the regrading work.  See <u>Omar Oil and Gas Co.</u>
<u>v. Mackenzie Oil Co.</u>, 128 A. 392, 396 (Del. 1926).

SCRG contends, in the alternative, that it believed
that defendants were authorized to use Vialco's 1994 CZM permit,
which allowed for expansion of the red mud disposal area.  SCRG
alleges that defendants violated the terms of Vialco's CZM permit
by failing to construct and maintain the dike walls and drains as
required, stripping the containing vegetation when terra-forming
without a separate permit, and failing to maintain a fund
sufficient to close the red mud disposal area.

Defendants warranted only that there existed no
undisclosed violations on the Property of which they had
knowledge.  As noted above, however, SCRG knew that defendants
had no permit for the regrading work that they did, and thus SCRG
did not rely on the warranty.  Defendants did not provide any
warranty about Vialco's CZM permit.  SCRG cannot prevail on a
breach of warranty claim merely because of its belief that
defendants had obligations under the Vialco permit.

Defendants have come forward with undisputed evidence
that SCRG closed on the Property fully aware of the permit
violation and did not, in fact, rely on the warranties within the
PSA about the CZM permit.  Accordingly, we will enter judgment
for defendants on the breach of warranty for permit violations.

Finally, SCRG alleges that defendants breached the warranty contained in § 8.1.4, which provides that "to [defendants'] knowledge, there are no hazardous materials on the Property which violate [the Environmental Law], except as disclosed in Exhibit 8.1.4 attached hereto and made a part hereof, of in the Environmental Reports." SCRG alleges that defendants failed to disclose hazardous materials buried on the Property in the old red mud disposal area. It argues that defendants have not challenged this alleged breach of warranty in their motion.[3]

Defendants admit that hazardous materials were buried in the old red mud area. They argue, however, that those materials were disclosed in the Environmental Reports referenced in the PSA and provided during due diligence, and that any violation disclosed in the Environmental Reports was excluded from the warranty. Defendants reference the G&M Report which states that the wells in the vicinity of the old red mud ponds exceed the standards for pH, chlorine, fluoride, TDS, fluoride, aluminum, arsenic, molybdenum, and selenium.

SCRG has come forward with the declaration of Jack Thomas, the Vice President of Development for SCRG and General Manager and owner of plaintiff Brownfield Energy Recovery Corp. Thomas states that none of the reports mentioned filter cloth and

_____

3. Defendants maintain that plaintiffs did not specifically allege any breach of the warranty in § 8.1.4. We find this argument to be without merit.

-17-

other industrial waste in the current red mud disposal area or unwashed high-pH residue and pure bauxite "liquor" in the old red mud disposal area. He alleges that defendants' representatives told him that the red mud disposal areas contained only "washed" red mud. This evidence creates a genuine issue of material fact as to whether defendants adequately disclosed the hazardous materials. Therefore, we will deny defendants' motion for summary judgment for claims of breach of the warranty contained in § 8.1.4.

IV.

We now turn to defendants' motion for summary judgment on SCRG's claim that defendants breached their contractual duty to complete all corrective action required by DPNR in § 6.2(e) of the PSA, as amended by the letter agreement, and to indemnify SCRG from all liability relating to the red mud releases.

Section 6.2 of the PSA is entitled "Seller's Retained Liabilities," in which defendants retained liability for a number of environmental matters. In § 6.2(e), as amended by the letter agreement, defendants retained

> All liability arising out of ... that certain release of red mud into the wetlands and the sea on or about March and April, 2002 ... (the "Red Mud Release") ... including, but not limited to all corrective action required by the U.S. Environmental Protection Agency, the Government of the Virgin Islands of the United States, Department of Planning and Natural Resources, Division of Environmental Protection and any other governmental body or agency having jurisdiction over this matter, in order to correct, clean up, minimize, mitigate or otherwise cure the Release, as

> well as the matter described in that certain
> Supplemental Order dated April 18, 2002 and
> issued by the Department of Planning and
> Natural Resources ("DPNR"), Division of
> Environmental Protection, with the
> understanding that the Seller retains any and
> all liability arising out of any notice,
> claim, administrative proceeding or
> litigation brought by any party or entity
> which arises out of the Release and the
> Supplemental Order...

This section of the PSA exempts defendants from responsibility for any work in the red mud disposal areas except for their liability in connection with the April 18, 2002 Supplemental Order. In this section, defendants agreed to complete any corrective work ordered by DPNR at their own expense, up to $250,000, and SCRG was required to allow defendants access to the Property for the purposes of completing this work. The section continues that SCA

> reserves its right to the extent provided by
> law to challenge any action of the DPNR that
> it, in its sole discretion, deems to be
> unreasonable, impractical, arbitrary,
> capricious, unduly burdensome, contrary to
> fact, or contrary to law.

In § 6.5, SCRG agreed to "indemnify, defend and hold harmless" defendants from any and all claims and costs of remediating the property, except for those liabilities which defendants explicitly retained in § 6.2.

SCRG alleges that defendants have not performed all the corrective action ordered by DPNR, have not performed the work sufficiently or adequately, have subjected SCRG to liability, and have refused to indemnify SCRG for that liability. SCRG

maintains that these breaches constitute defendants' repudiation of the PSA and entitle SCRG to excuse from any further performance under the PSA, including §§ 6.3, 6.4, and 21.

Defendants argue that the PSA does not create any contractual obligations owed to SCRG. Instead, defendants characterize § 6.2 as only an obligation to retain "all liability" for the red mud release, including all corrective action ordered by DPNR. They maintain that they have not breached their obligation to take corrective action ordered by DPNR. They rely on the provision of the PSA that allows them to challenge any DPNR order. According to defendants, a breach can only occur if they refuse to comply with a final, binding order.

SCRG has come forward with an August 10, 2006 letter from Dean C. Plaskett, Commissioner of the DPNR, to SCA. In this letter, Plaskett finds that defendants have "failed to comply with [their] obligations," as outlined in the Agreed Order. The letter continues, "DPNR finds your assertion that SCA has now complied with the April [18, 2002 Supplemental] Order to be laughable. This assertion indicates a complete lack of credibility on the part of SCA." Finally, the letter ends by noting that defendants "continue to have an obligation to comply with the April Order." SCRG also references the DPNR's 2007 lawsuit against it for the effects of the red mud release. See Commissioner of Department of Natural Resources v. St. Croix Renaissance Group, LLLP, Civ. A. No. 07-114 (D.V.I.);

_Commissioner of Department of Natural Resources v. Century Alumina_, Civ. A. No. 05-62 (D.V.I.).

SCRG has not produced any relevant evidence that defendants have breached their obligation to retain liability for the red mud releases in § 6.2(e) of the PSA. The PSA specifically grants defendants the right to pursue legal challenges to DPNR's orders, which is what defendants are currently doing in _Commissioner of Department of Natural Resources v. Century Alumina_, Civ. A. No. 05-62 (D.V.I.). While defendants are engaged in that legal challenge, we agree there can be no breach since they are exercising their contractual rights. Any claim by SCRG is premature, and we will dismiss it without prejudice.

SCRG also makes a claim that defendants have breached the contract by refusing to defend and indemnify them for the liability of the red mud releases under § 6.5 of the PSA. While the DPNR suit against SCRG is pending, the issue of whether defendants have a duty to indemnify SCRG for any eventual losses SCRG might suffer in the underlying suit is not yet ripe and must fail. _See_ _Lapoint v. AmerisourceBergen Corp._, 970 A.2d 185, 197-198 (Del. 2009). We will likewise dismiss that claim without prejudice.

Whether defendants have a duty to defend SCRG, however, is ripe for decision during the pendency of the underlying action. Any duty to defend does not depend on the outcome of the DPNR action. _Id._ at 197. SCRG maintains that § 6.5 of the PSA

-21-

creates a duty on the part of defendants to defend SCRG.
However, SCRG misstates § 6.5.  Section 6.5 creates a duty on the
part of SCRG to defend defendants for all liabilities outside of
§ 6.2.  It does not contain any reciprocal duty on the part of
defendants.  Accordingly, we will enter judgment in favor of
defendants on SCRG's claims for breach of contract based on
defendants' duty to defend.

V.

SCRG's count for fraud in the inducement alleges that
defendants made intentional, knowing misrepresentations through
the representations and warranties set forth in the PSA with the
intent to defraud plaintiffs.  Specifically, SCRG alleges that
defendants knew about six violations of environmental law, as
defined in the PSA, but expressly stated that there were no
undisclosed known violations in order to induce plaintiffs to
close.  These violations of environmental law are:  (1) an
undisclosed series of red mud releases into the sea; (2) each of
the red mud releases individually; (3) intentional red mud
releases by SCA; (4) new, high-pH caustic seeps into the sea; (5)
the issuance of red mud into the sea; and (6) failure to have a
permit for regrading.  SCRG argues that none of these alleged
environmental law violations is excluded from defendants'
warranties by the PSA and that defendants intentionally withheld
the existence of these violations from SCRG in order to induce
plaintiffs to agree to the $3 million cap on defendants'
liability and proceed to closing.

Defendants counter that they are entitled to judgment as a matter of law because SCRG's fraud claim is predicated on a breach of contract. They contend that the PSA requires that any claim against them relating to contractual obligations be brought as a breach of contract claim. In addition, defendants also submit that the PSA's disclaimer of reliance on any extra-contractual representations prevents plaintiffs from bringing a claim for fraud in the inducement.

As an initial matter, since we have found that SCRG has produced insufficient evidence to move forward on its breach of contract claims for elevated-pH groundwater in the Alucroix Channel and permit violations, there can be no fraud in the inducement relating to those alleged violations. We will enter summary judgment on SGRG's fraud claim with respect to these particular issues.

"[T]he 'gist of the action' doctrine bars plaintiffs from bringing a tort claim that merely replicates a claim for breach of an underlying contract." Werwinski v. Ford Motor Co., 286 F.3d 661, 680 (3d Cir. 2002). Our Court of Appeals has explained that, "to be construed as a tort action, the [tortious] wrong ascribed to the defendant must be the gist of the action with the contract being collateral." Bohler-Uddelholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001). Defendants submit that Virgin Islands law dictates the application of the gist of the action doctrine here. SCRG responds that Delaware law governs because the PSA specifies that

-23-

it "shall be construed under the laws of the State of Delaware"
and its fraud claim is based on false representations made in the
PSA.

A federal court must apply the choice-of-law rules of
the forum in which it sits to determine what jurisdiction's
substantive law applies.  See Klaxon Co. v. Stentor Elec. Mfg.
Co., 313 U.S. 487, 496 (1941).  The courts of the Virgin Islands
apply the choice-of-law rules as set forth in the Restatement
(Second) of Conflict of Laws.  B A Properties, Inc. v. Aetna Cas.
& Sur. Co., 273 F. Supp. 2d 673, 680 (D.V.I. 2003); see 1 V.I.C.
§ 4.  For fraud and misrepresentation claims, the Virgin Islands
applies § 148 of the Restatement (Second) of Conflict of Laws.
Under § 148(1), it will apply the law of the state where:

> the false representations were made and
> received, ... unless, with respect to the
> particular issue, some other state has a more
> significant relationship under the principles
> stated in § 6 to the occurrence and the
> parties.

Defendants maintain that "[t]he contacts with the
Virgin Islands are legion."  They have pointed to nothing in the
record to support this statement.   Significantly, they have not
referenced any statements concerning the formation of the
contract which were made or relied upon in the Virgin Islands.

In contrast, SCRG cites the sworn declaration of Jack
Thomas, its Vice President of Development, which states that
negotiations took place in-person in Miami, Florida and
Pittsburgh, Pennsylvania or on the telephone from each party's

place of business.  SCRG has also produced the deed to the
Property, which conveys it from SCA to SCRG.  It was executed and
notarized in Pennsylvania.  Finally, SCRG has produced the PSA,
which states that the purchase monies were to be wired to a bank
in Miami, Florida and that all closing documents were executed
and delivered in Miami, Florida.

It is undisputed that the Property is located in the
U.S. Virgin Islands.  It is also undisputed that SCRG and SCA are
Delaware limited liability partnerships, that Brownfield is a
Florida corporation, that Energy Answers is a Puerto Rico
corporation, and that Alcoa is a Delaware corporation with its
principal place of business in Pennsylvania.

Thus, there is no one state where the reliance occurred
or where the allegedly false or fraudulent statements were made.
Consequently, we must determine "the state which, with respect to
the particular issue, has the most significant relationship to
the occurrence and the parties."  Restatement (Second) of
Conflicts § 148(2).  In making this determination, we must
consider a number of factors in § 148(2),[4] as well as the general

_____

4.  Section 148(2) includes a list of non-exclusive factors to
consider when determining which state has the most significant
relationship to the occurrence and the parties.  They are:

    (a) the place, or places, where the plaintiff acted in
    reliance upon the defendant's representations,
    (b) the place where the plaintiff received the
    representations,
    (c) the place where the defendant made the
    representations,
    (d) the domicile, residence, nationality, place of
                                          (continued...)

-25-

principles enumerated in § 6 of the Restatement (Second) of Conflicts.[5]

      The two jurisdictions that have the most significant relationship with the parties and the occurrence are the Virgin Islands and Delaware. The Virgin Islands is the place where the property in issue is situated and where any underlying environmental issues exist and will have to be resolved. Delaware is the state where SCRG and SCA are organized. The parties have also agreed that the PSA is to be construed under

---

4.(...continued)
    incorporation and place of business of the parties,
    (e) the place where a tangible thing which is the
    subject of the transaction between the parties was
    situated at the time, and
    (f) the place where the plaintiff is to render
    performance under a contract which he has been induced
    to enter by the false representations of the defendant.

Restatement (Second) of Conflicts § 148(2).

5. Section 6 of the Restatement (Second) of Conflicts lists non-exclusive factors "relevant to the choice of the applicable rule of law." They are:

    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of the other interestes states and
    the relative interests of those states in the determination
    of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of
    law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to
    be applied.

Restatement (Second) of Conflicts § 6(2)

Delaware Law.  The alleged fraud was in connection with the formation of this contract.

While the location of the Property is an important factor, the close relationship of the alleged fraud to the contract sways us in favor of Delaware as the jurisdiction with the most significant relationship to the occurrence.  The Restatement (Second) of Conflicts § 6, as noted above, counsels us to consider the expectation of the parties in selecting the applicable law.  Here, the parties recognized the inherent problem with a multi-party, multi-jurisdiction negotiation and transaction and agreed that Delaware law should govern their agreement.  Because the alleged fraud is so intertwined with these negotiations and the resulting agreement, we believe that Delaware has a stronger relationship to the occurrence of the alleged fraud than does the Virgin Islands.  Additionally, Delaware is more significantly related to the parties themselves than are the Virgin Islands because both SCRG and SCA are Delaware entities.  Therefore, we will apply Delaware law to SCRG's claim for fraud in the inducement.

Delaware courts have not adopted the gist of the action doctrine for fraud in the inducement.  Instead, Delaware has a strong public policy against fraud that explicitly allows a party to bring a claim for fraud in the inducement based on contractual warranties.  See Abry Partners V, L.P. v. F.&W. Acquisition LLC, 891 A.2d 1032, 1035-36 (Del. Ch. 2006); see also Airborne Health, Inc. v. Squid Soap, LP, 2009 Del. Ch. LEXIS 196, at *20 (Del. Ch.

Nov. 23, 2009).  In <u>Abry Partners</u>, the Chancery Court explained
that, "[i]f there is a public policy interest in truthfulness,
then that interest applies with more force, not less, to
contractual representations of fact.  Contractually binding,
written representations of fact ought to be the most reliable
representations, and a law intolerant of fraud should abhor
parties that make such representations knowing that they are
false."  891 A.2d at 1057.  Moreover, Delaware will not enforce
any contractual damage limit on a fraud claim.  As stated in <u>Abry
Partners</u>, "When a seller intentionally misrepresents a fact
embodied in a contract -- that is, when a seller lies -- public
policy will not permit a contractual provision to limit the
remedy of the buyer to a capped damage claim.  Rather, the buyer
is free to press a claim for rescission or for full compensatory
damages."  <u>Id.</u> at 1035.  <u>See also</u> <u>Addy v. Piedmonte</u>, 2009 Del.
Ch. LEXIS 38 (Del. Ch. Mar. 18, 2009).

        Accordingly, we will deny defendants' motion for
summary judgment on SCRG's claim for fraud in the inducement,
except as it relates to the elevated-pH groundwater in the
Alucroix channel and the alleged permit violations.  If SCRG
proves to the jury all of the elements of fraud under Delaware
law, then SCRG will be entitled to either rescission of the
contract or full compensatory damages, notwithstanding the $3
million cap on defendants' liability contained in the PSA.

Finally, SCRG contends that defendants were negligent in their work to remediate and correct the regraded red mud disposal area, which resulted in additional damages to the Property. Defendants contend that, under Virgin Islands law, the gist of the action doctrine bars SCRG's claims for negligence.[6] Defendants argue that they had a contractual obligation through the PSA to take the corrective action to remediate the red mud release, except for the contouring and vegetating of the red mud disposal area. It is the defendants' position that, if SCRG is unhappy with the remediation, SCRG must bring a breach of contract claim and not a negligence claim.

SCRG does not dispute that the gist of the action doctrine would bar any negligence against defendants for wrongful or improper remediation work. SCRG, instead, maintains that defendants negligently caused damages unrelated to the remediation while on the Property to clean-up the red mud release. The PSA, as amended by the June 13, 2002 letter, obligated defendants to take "all corrective action required ... in order to correct, clean up, minimize, mitigate or otherwise cure" the red mud release.

SCRG cites to a deposition of Kenneth C. Haines, an environmental consultant for SCRG and former employee of a prior owner of the Property. Haines testified that around February

---

6. Both parties concede that Virgin Islands law controls SCRG's claim for negligence.

2003 Alcoa contractors stripped storm-water control vegetation from the red mud disposal area with their bulldozers. He also stated that the Alcoa contractors destroyed irrigation piping that had been used to water vegetation in that area. According to his testimony, the vegetation was meant to prevent erosion of the red mud. SCRG has also produced an email by Haines relating similar bulldozer damage and photographs of the damage.

SCRG also points to the declaration of Jack Thomas, the Vice President of Development for SCRG and General Manager and owner of plaintiff Brownfield Energy Recovery Corp. In that declaration he outlines other damages to the Property allegedly done by Alcoa workers. Thomas states that the bulldozer damage referenced by Haines was done "[w]ell away from the area related to contract performance in which they were working." He also alleges that "Alcoa built a massive retaining structure out of old tires that was not part of the DPNR approved construction work." Finally, he claims that Alcoa workers created a flow of red mud that destroyed a settlement pond and cooling ponds essential to the continued use of the Property.

A party's contractual obligation does not insulate it from tort liability for negligent acts committed while performing that contractual obligation if the wrong occurs outside of the scope of the contractual obligation. See Charleswell v. Chase Manhattan Bank, N.A., 308 F. Supp. 2d 545, 571-572 (D.V.I. 2004). For example, if a homeowner hires a painter to paint her house, she cannot sue the painter for negligence if the painter does a

poor job painting or uses the wrong color.  The gist of the
action doctrine would compel the homeowner to seek relief through
a breach of contract action.  If, however, the painter backs his
truck through the homeowner's garage door when arriving on the
job, the homeowner can certainly bring a negligence claim because
the painter's wrongful conduct fell outside the scope of the
contractual agreement.  SCRG has presented sufficient evidence
that defendants' actions were separate and apart from its
contractual obligations under the PSA to advance to trial on this
claim.

Defendants also argue that SCRG's claim must fail
because defendants owed SCRG no extra-contractual duties.
Defendants' contention is unavailing.  They owed to SCRG, at all
times, a duty of due care.  The Virgin Islands has adopted the
Restatement (Second) of Torts, which explains this ever-present
duty as, "that which a reasonable man in his position, with his
information and competence, would recognize as necessary to
prevent the act from creating an unreasonable risk of harm to
another."  Restatement (Second) of Torts § 298.  Even if
defendants had no contractual or specific duty while on the
Property after the closing, they still owed SCRG a duty of
reasonable care while on the land.  Therefore, we will deny
defendants' motion for summary judgment on SCRG's negligence
claim.