```
         IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                    DIVISION OF ST. CROIX

ST. CROIX RENAISSANCE GROUP,    :       CIVIL ACTION
LLLP, et al.                    :
                                :
         v.                     :
                                :
ST. CROIX ALUMINA, LLC, et al.  :       NO. 04-67
```

MEMORANDUM

Bartle, C.J.                                        May 31, 2011

          The court is presently faced with the post-trial motion
of defendant St. Croix Alumina, LLC ("SCA") under Rule 50(b) of
the Federal Rules of Civil Procedure for judgment as a matter of
law on all claims after an adverse jury verdict.  Alternatively,
SCA moves for a new trial under Rule 59.  We also address the
request of plaintiff St. Croix Renaissance Group. LLLP ("SCRG")
for prejudgment interest.

          This diversity action arises out of the June 2002 sale
to Brownfield Recovery Corporation ("Brownfield Recovery") and
Energy Answers of Puerto Rico ("Energy Answers") of SCA's large
industrial site in St. Croix, which contained a now-closed
alumina refinery (the "Property").  Immediately after closing on
the Property on June 14, 2002, Brownfield Recovery and Energy
Answers transferred the Property and all their rights and
obligations under the purchase agreement to SCRG, an entity
created for the sole purpose of owning and managing the

Property.[1]  In the Second Amended Complaint, SCRG pleaded claims
for fraud in the inducement (count 1), breach of contract (count
2), and negligence (count 3).[2]  SCRG sought compensatory and
punitive damages.  SCRG's claim for breach of contract was based
on SCA's breach of a warranty set forth in the March 2002
purchase agreement for the Property and confirmed at closing.
Its claim for fraud in the inducement was predicated on the same
warranty, which allegedly was false and induced SCRG to agree to
purchase the Property with a $3 million cap on damages for any
breach of contract.  Finally, SCRG sued SCA for damages to the
Property as a result of SCA's alleged negligence which occurred

---

1.  The Second Amended Complaint named SCRG, Brown Recovery
Corp., and Energy Answers of Puerto Rico as plaintiffs.  It
listed SCA and Alcoa World Alumina as defendants.  Just prior to
trial, the parties entered into a stipulation to simplify the
proceedings.  The parties agreed that in addressing the jury,
SCRG would be the sole plaintiff mentioned, but that it
maintained the rights of Brown Recovery and Energy Answers, and
that any judgment would be entered as to SCRG only.  SCRG agreed
to have Brown Recovery and Energy Answers voluntarily dismissed
with prejudice.  In addressing the jury, SCA was referred to as
the sole defendant but maintained all rights and duties as if
Alcoa World Alumina were identified at trial.  Defendants SCA and
Alcoa World Alumina made the representation that SCA had
sufficient funds to satisfy any judgment so that Alcoa World
Alumina could be dismissed from the case when final judgment was
entered.  They were dismissed by stipulation on January 19, 2011
(Docket No. 422).

2.  The Second Amended Complaint also contained claims for fraud
in the performance (count 4) and punitive damages (count 5).  The
claim for fraud in the performance was premised upon concealment
of certain activities on the Property after closing, including
the misrepresentation of doing certain work on the Property
pursuant to a government permit.  SCRG agreed to the dismissal of
count 4 prior to trial.  While the punitive damages claim as a
separate count was also dismissed, the request for relief in the
form of punitive damages remained.

after the closing when contractors were doing remedial work on the Property pursuant to an obligation of SCA under the purchase agreement.

After a seven-day trial, the jury returned a verdict in favor of SCRG on all three counts.  It awarded $12,617,867 for breach of contract and fraud in the inducement, $10,000,000 as a result of SCA's negligence, and $6,142,856 in punitive damages.

I.

With respect to SCA's motion for judgment as a matter of law, the court must view the evidence, along with all reasonable inferences therefrom, in the light most favorable to the verdict winner, in this case, SCRG.  Alexander v. Univ. of Pittsburgh Med. Ctr. Sys., 185 F.3d 141, 145 (3d Cir. 1999).

SCA first asserts that there is no evidence to support the jury's verdict in favor of SCRG on its negligence claim. SCRG alleged that, after the June 2002 closing, SCA negligently ripped up vegetation and irrigation piping on the north side of Area A, a section of the Property where large piles of "red mud" were stored.  Red mud is a caustic byproduct of the alumina refinement process, and piles of left-over red mud erode into the environment if not secured by vegetation or retaining walls.  SCA was working on the Property after the closing pursuant to a contractual obligation with SCRG to undertake certain remediation activities necessitated by an April 2002 red mud spill on the south side of Area A.

-3-

At trial, SCRG presented testimony from Patrick Mahoney, the President of Energy Answers and a partner in SCRG, and Ken Haines, an environmental consultant for SCRG and former employee of a prior owner of the Property.  The court also admitted into evidence several photographs of Area A showing bulldozer tracks and the absence of vegetation.

Mahoney testified that he had seen bulldozers on the north slope of Area A starting in early 2003.  He observed parts of the Area being "cut back down to the red mud."  Haines testified that in April 2003 he saw extensive damage to the irrigation piping and vegetation on the north side of Area A as well as bulldozer tracks.  There was sufficient evidence for a jury to infer that someone had bulldozed the north side of Area A and that this activity had caused damage to the vegetation and irrigation piping.

It is undisputed that neither SCA nor SCRG had employees on the Property who were operating bulldozers at any relevant time.  However, SCA had engaged an independent contractor to do remediation work, which included the use of this type of equipment.

It is the general rule that a party is not liable for the negligence of an independent contractor it engages to perform work.  See Restatement (Second) Torts § 409.  There are two exceptions.  First, if the party gave orders or directions to the independent contractor to commit the particular negligent act, the party is liable for the resulting harm.  See Restatement

-4-

(Second) Torts § 410.  There is nothing in the record to suggest
that SCA directed any bulldozer driver to tear up the irrigation
piping and vegetation or even to work on the north side of Area
A.  On the contrary, Eric Black, an SCA employee and its on-site
representative during the post-closing remediation, testified
that he did not authorize any work at that location.  Even if
Black had authorized work to be done, such authority does not
establish that he directed any negligent acts to be performed.
SCA cannot be held liable for an independent contractor's
negligence under this exception.

Second, a party may be liable for the contractor's
negligence if a party "retained at least some degree of control
over the manner in which the work was done."  Restatement
(Second) Torts 414, cmt. c.  Nonetheless, such control must
involve more than the day-to-day activities of a general
overseer.  See Figueroa v. Hess Oil V.I. Corp., 198 F. Supp. 2d
632, 644 (D.V.I. 2002).  Liability attaches only where the party
"assumes affirmative duties, directs the method of performance of
those duties, or offers specific instruction regarding the manner
of performance."  Id.

SCRG points to evidence in the record that in its view
supports the finding that SCA exercised sufficient control over
the bulldozer driver to hold SCA liable for his acts.  It focuses
on the testimony of Black that when the bulldozer driver came
onto the property he "worked at the direction of SCA."  Further,
Ken Haines told the jury that he observed a bulldozer being

-5-

operated on the north side of Area A.  When Haines questioned the
driver, the latter stated that he was there doing work for Black
and had entered through the back gate, to which SCA had a key.

Again, even if the bulldozer driver worked at the
direction of SCA, it does not prove SCA's liability.  It is no
different, in our view, than a homeowner directing a house
painter to paint her living room a certain shade of yellow.  This
does not make the painter her agent if he negligently dumps a can
of paint on a guest in the house.  Here, no evidence exists that
Black directed the method of performance of the bulldozer driver
or gave him specific instructions as to how to engage in any
remediation work.

Furthermore, the statement of the bulldozer driver to
which Haines testified cannot establish liability.  It is well
established under Virgin Islands Law that "[e]vidence of a
statement by an agent concerning the existence or extent of his
authority is not admissible against the principal to prove its
existence or extent, unless it appears by other evidence that the
making of such statement was within the authority of the agent
or, as to persons dealing with the agent, within the apparent
authority or other power of the agent."  Restatement (Third)
Agency § 285; see also Mendez v. HOVENSA, L.L.C., 49 V.I. 849,
862 (D.V.I. Mar. 31, 2008).  No other evidence exists in the
record of actual, implied, or apparent authority.  While, as
noted, Black testified that the bulldozer driver worked at his
direction, he also stated that he did not authorize any work on

-6-

the north side of Area A.  Even if the jury disbelieved Black, it may not infer the opposite of his statement, that is, that he did authorize bulldozing on the north side of Area A.  See U.S. v. Urban, 404 F.3d 754, 782 (3d Cir. 2005); Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 512 (1984).

There is no competent evidence that Black directed specific negligent acts or otherwise exercised any greater control than that of a general overseer.  SCRG has failed as a matter of law to establish that SCA can be held liable for an independent contractor's negligence in damaging the vegetation and irrigation piping on the north side of Area A.

Accordingly, we will enter judgment in favor of SCA and against SCRG on SCRG's claim for negligence.[3]

## II.

SCA next attacks the jury's verdict as to breach of contract and fraud in the inducement.  In these claims, SCRG alleged that SCA made intentional, knowing misrepresentations with the intent to defraud SCRG through the representations and warranties set forth in the March 2002 purchase agreement and reaffirmed at the June 2002 closing.  Brownfield Recovery and Energy Answers, predecessors to SCRG, signed the purchase agreement along with SCA and its parent company Alcoa World

---

3.  In its motion for judgment as a matter of law, SCA also contended that the jury's award of $10,000,000 to SCRG for SCA's negligence was excessive in light of the fact that SCRG sought only $6,142,856 at trial.  SCRG agreed that the award was in excess of what it sought.  In light of our decision in favor of SCA on SCRG's negligence claim, we need not address this issue.

Alumina.[4]  The purchase agreement stated that it "shall be construed under the laws of the State of Delaware, excluding those related to conflicts or choice of law."  As previously stated, SCA reaffirmed all the warranties and representations in the purchase agreement at the closing on June 14, 2002.

The warranties in the purchase agreement provided that there were no undisclosed hazardous materials on the Property, that SCA had not received any written notices of violations of environmental law that it had not disclosed, and that "there are no such violations outstanding of the Environmental Law, except as disclosed on Exhibit 8.1.6 attached hereto and made part hereof, or in the Environmental Reports."  Exhibit 8.1.6 listed a variety of known violations of environmental law and any governmental actions that had been taken with respect to them. The purchase agreement limited the knowledge of the sellers to the knowledge of Eric Black, Tom Russell, Larry Grace, or Joe Norton.  Black and Norton served as the chief environmental officers for SCA and Alcoa World Alumina, respectively.  Russell acted as SCA's plant manager on the Property.  Grace was President of Alcoa World Alumina.

The purchase agreement also stated that "[n]o party making a claim under any breach of a representation or warranty may recover any losses in excess of $3,000,000.00."  SCRG

_____

4.  On the day of the closing, June 14, 2002, SCRG assumed all the rights and obligations set forth in the purchase agreement held by Brown Recovery and Energy Answers.

maintains that SCA knew about red mud releases that were violations of environmental law, as defined in the purchase agreement, but failed to disclose them in either Exhibit 8.1.6 or the Environmental Reports in order to induce SCRG's predecessors to close on the Property and agree to a $3 million cap on damages for any contractual breach.

In its earlier motion for summary judgment, SCA contended that Virgin Islands law should apply to SCRG's claim for fraud in the inducement and that Virgin Islands law barred such a claim under its "gist of the action" doctrine. See Werwinski v. Ford Motor Co., 286 F.3d 661, 680 (3d Cir. 2002). SCRG argued, in contrast, that Delaware law, which does not bar such a claim, was applicable. See Abry Partners V, L.P. v. F.&W. Acquisition LLC, 891 A.2d 1032, 1035-36 (Del. Ch. 2006). We agreed with SCRG. SCA now urges us to revisit the issue because, in its view, the evidence adduced at trial reveals that the contacts with the Virgin Islands were "more numerous and substantial" than those with Delaware.

We first addressed this choice-of-law issue in our December 23, 2009 Memorandum (Doc. No. 256) addressing SCA's motion for summary judgment. In that Memorandum, we stated:

> While the location of the Property is an important factor, the close relationship of the alleged fraud to the contract sways us in favor of Delaware as the jurisdiction with the most significant relationship to the occurrence. The Restatement (Second) of Conflicts § 6, as noted above, counsels us to consider the expectation of the parties in selecting the applicable law. Here, the

-9-

> parties recognized the inherent problem with
> a multi-party, multi-jurisdiction negotiation
> and transaction and agreed that Delaware law
> should govern their agreement.  Because the
> alleged fraud is so intertwined with these
> negotiations and the resulting agreement, we
> believe that Delaware has a stronger
> relationship to the occurrence of the alleged
> fraud than does the Virgin Islands.

St. Croix Renaissance Group, LLLP v. St. Croix Alumina, LLC, 2009

U.S. Dist. LEXIS 120525, *34 (D.V.I. Dec. 23, 2009).

We further explained in our December 23, 2009

Memorandum (Doc. No. 256):

> There is no one state where the reliance
> occurred or where the allegedly false or
> fraudulent statements were made.
> Consequently, we must determine "the state
> which, with respect to the particular issue,
> has the most significant relationship to the
> occurrence and the parties."  Restatement
> (Second) of Conflicts § 148(2).  In making
> this determination, we must consider a number
> of factors in § 148(2), as well as the
> general principles enumerated in § 6 of the
> Restatement (Second) of Conflicts.

Id. at 32 (footnotes omitted).  Section 148(2) of the Restatement

(Second) of Conflicts § 148(2) lists six non-exclusive factors to

consider when determining which state has the most significant

relationship to the occurrence and the parties.  They are:

> (a) the place, or places, where the plaintiff
> acted in reliance upon the defendant's
> representations,
> (b) the place where the plaintiff received
> the representations,
> (c) the place where the defendant made the
> representations,
> (d) the domicile, residence, nationality,
> place of incorporation and place of business
> of the parties,

(e) the place where a tangible thing which is
the subject of the transaction between the
parties was situated at the time, and
(f) the place where the plaintiff is to
render performance under a contract which he
has been induced to enter by the false
representations of the defendant.

Restatement (Second) of Conflicts § 148(2).  Section 6 of the

Restatement (Second) of Conflicts lists additional non-exclusive

factors to consider.  They are:

(a) the needs of the interstate and
international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of the other
interested states and the relative interests
of those states in the determination of the
particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the
particular field of law,
(f) certainty, predictability and uniformity
of result, and
(g) ease in the determination and application
of the law to be applied.

Restatement (Second) of Conflicts § 6(2).

We will review each of the § 148(2) factors in light of

the evidence presented at trial.  Section § 148(2)(a) requires us

to consider "the place, or places, where the plaintiff acted in

reliance upon the defendant's representations."  Any reliance on

SCA's representations did not occur until the purchase agreement

was signed in March 2002 and the closing on the Property took

place June 2002.  The record is unclear as to where each party

signed the purchase agreement in March 2002, but it does reflect

that the execution of the closing documents occurred in Miami,

Florida in June 2002, not the Virgin Islands.

-11-

Subsection (b) references "the place where the plaintiff received the representations."  The representation in question is the allegedly false warranty in the purchase agreement, which the parties finalized when they executed the closing documents in Florida.

We must next weigh "the place where the defendant made the representations."  Restatement (Second) Conflicts § 148(2)(c).  SCA contends that it made the representations in the Virgin Islands since all due diligence related to the environmental conditions of the Property occurred on-site in St. Croix.  We disagree.  The representations were not made during the due diligence but when SCA signed the purchase agreement containing the false representations in question.  It was not until this point that the reliance of SCRG or any of its predecessors began.  As noted above, the contract was executed in Florida.  Furthermore, the negotiations leading up to the contract took place over a period of months in various places other than the Virgin Islands.

Under subsection (d) of § 148(2), we must consider "the domicile, residence, nationality, place of incorporation and place of business of the parties."  It is undisputed that both SCRG, a limited liability limited partnership, and SCA, as well as Alcoa World Alumina, both signatories to the purchase agreement, are organized under the laws of Delaware.  Brownfield Recovery and Energy Answers, also signatories to the purchase agreement, are corporations organized under the laws of Florida

-12-

and Puerto Rico, respectively.  SCA maintains that the "place of
business" of the parties is the Virgin Islands.  While SCRG does
business in the Virgin Islands, it did not begin doing so until
after the closing in June 2002, and thus only after any fraud
took place.  SCA ceased operating its alumina refinery on the
Property in St. Croix before the purchase agreement was executed.
The other parties to the purchase agreement had places of
business in Massachusetts, Pennsylvania, New York, Florida, and
Puerto Rico.  Thus, this factor does not strongly weigh in favor
of applying Virgin Islands law.

Subsection (e) of § 148(2) directs that we take into
account "the place where a tangible thing which is the subject of
the transaction between the parties was situated at the time."
The Property which was the subject of the purchase agreement was
in the Virgin Islands.

Finally, § 148(2)(f) sets forth as a factor "the place
where the plaintiff is to render performance under a contract
which he has been induced to enter by the false representations
of the defendant."  SCA again argues that this subsection of the
Restatement supports application of Virgin Islands law.  We are
not persuaded.  The performance which the predecessors of SCRG
were to render was the payment of monies for the Property.  As
stated above, all moneys paid for the Property were wired to a
bank in Florida, not the Virgin Islands.  It cannot even be said
that SCRG took possession of the Property in the Virgin Islands

-13-

as the deed was executed and notarized in Pennsylvania and the closing documents were executed in Florida.

The Property, we acknowledge, is located in the Virgin Islands. Nonetheless, most of the parties to the purchase agreement were multi-state enterprises with employees located in New York, Pennsylvania, Florida, Delaware, Puerto Rico, and Massachusetts. The representations made by SCA at issue here are not representations made in St. Croix during due diligence, as SCA would have us believe, but rather the representations made in the contract for the sale of the Property. Most of the parties were not doing business in the Virgin Islands when the closing occurred in June 2002. The factors listed in § 148(2) of the Restatement (Second) of Conflicts do not strongly weigh in favor of the application of Virgin Islands law to SCRG's fraud claim.

In addition, we must focus on § 6 of the Restatement (Second) of Conflicts which lists further non-exclusive factors "relevant to the choice of the applicable rule of law." As we wrote in our December 23, 2009 Memorandum (Doc. No. 256):

> The Restatement (Second) of Conflicts § 6, as noted above, counsels us to consider the expectation of the parties in selecting the applicable law. Here, the parties recognized the inherent problem with a multi-party, multi-jurisdiction negotiation and transaction and agreed that Delaware law should govern their agreement. Because the alleged fraud is so intertwined with these negotiations and the resulting agreement, we believe that Delaware has a stronger relationship to the occurrence of the alleged fraud than does the Virgin Islands. Additionally, Delaware is more significantly related to the parties themselves than are

-14-

> the Virgin Islands because both SCRG and SCA
> are Delaware entities.

St. Croix Renaissance Group, 2009 U.S. Dist. LEXIS at *34.  This
analysis remains sound after thorough consideration of the
evidence presented at trial.  As we have previously stated, the
fraud in the inducement is intertwined with the contractual
negotiations.  There is no evidence that the negotiations took
place in the Virgin Islands.  Finally, we reiterate that the
execution of the contract itself occurred outside the Virgin
Islands.  To bring certainty to this multi-party transaction
which involved parties located in a number of different
jurisdictions and some of which were Delaware entities, the
parties agreed that the purchase agreement should be governed by
Delaware law.  The state of Delaware clearly had a strong
interest in having its law apply to a fraud-in-the-inducement
claim involving a contract governed by its laws.  See Restatement
(Second) Conflicts § 6(c).  Furthermore, application of Delaware
law clearly protects the justified expectations of the parties
under the circumstances.  See Restatement (Second) Conflicts
§ 6(d).  Accordingly, we again conclude that Delaware law applies
to SCRG's claim for fraud in the inducement.[5]

---

5. This is in contrast to fraud in the performance, which was a
separate count in the Second Amended Complaint and which related
to post-closing conduct of SCA that took place on the Property in
the Virgin Islands and would be governed by Virgin Islands law.
SCRG did not pursue this claim once objected to in SCA's motion
for summary judgment.

III.

SCA further argues that SCRG did not prove any element

of its fraud claim by clear and convincing evidence.  As

explained in our instructions to the jury, to prevail on its

claim for fraud, SCRG was required to prove the following

elements by clear and convincing evidence:

> (1) the warranty contained in the purchase
> agreement was false, that is that Eric Black,
> Tom Russell, Larry Grace, or Joe Norton knew
> about an outstanding violation of the
> Environmental Law and failed to disclose it
> on Exhibit 8.1.6 or in the Environmental
> Reports;[6]
> (2) any of the four individuals, that is Eric
> Black, Tom Russell, Larry Grace, or Joe
> Norton, knew prior to June 14, 2002 that the
> warranty was false at the time that it was
> made;
> (3) any of the four individuals made the
> false warranty with the intent to induce the
> plaintiff to sign the purchase agreement;
> (4) the plaintiff justifiably relied on the
> warranty in the purchase agreement in deciding
> whether to sign it; and
> (5) the plaintiff was damaged as a result of
> its reliance on the false warranty.

SCA can only prevail on its motion for judgment as a matter of

law if, viewing all the evidence in the light most favorable to

SCRG, the record is "'critically deficient of that minimum

quantum of evidence from which the jury might reasonably afford

relief.'"  Fineman v. Armstrong World Indus., 980 F.2d 171, 190

(3d Cir. 1992).  We recognize that a "scintilla of evidence is

---

6.  As previously noted, the purchase agreement limited the
requirement to disclose all known environmental violations on the
Property to those violations known by Black, Russell, Grace, or
Norton.

-16-

not enough to sustain a verdict of liability." <u>Jaguar Cars, Inc.</u> <u>v. Royal Oaks Motor Car Co., Inc.</u>, 46 F.3d 258, 270 (3d Cir. 1995).  The question before us is "whether there is evidence upon which the jury could properly find a verdict" for SCRG.  <u>Id</u>.  In doing so, we may not weigh the evidence nor pass on the credibility of witnesses.  <u>Id</u>. at 269-70.

There was sufficient evidence for the jury to find by clear and convincing evidence that the warranty stated in the purchase agreement and reaffirmed at closing was false in representing that all known environmental violations had been disclosed.  The record clearly reveals that SCA had not disclosed certain multiple releases of red mud from Area A into the waters of the Virgin Islands.  Such releases constituted unremediated violations of environmental law.

The Virgin Islands Water Pollution Control Act prohibits the discharge of any pollutant into a "water of the Virgin Islands."  <u>See</u> 12 V.I.C. § 185(a).  The court ruled that the West Ditch, a drainage system on the Property, constituted a "water of the Virgin Islands" as defined in that statute.[7]  <u>See</u>

---

7.  The statute, in relevant part, provides that:
    "Waters of the United States Virgin Islands" means all waters within the jurisdiction of the United States Virgin Islands including all harbors, streams, lakes, ponds, impounding reservoirs, marshes, water-courses, water-ways, wells, springs, irrigation systems, drainage systems and all other bodies or accumulations of water, surface and underground, natural or artificial, public or private, situated wholly or partly within or bordering upon the United States Virgin Islands, including the territorial seas, contiguous zones, and oceans.
                                                    (continued...)

12 V.I.C. § 182(f).  Thus, any discharge of red mud, a pollutant, into the West Ditch constituted a violation of that local environmental law.

At trial, Bruce Green, an employee of the Virgin Islands Department of Planning and Natural Resources assigned to monitor the environmental issues at the Property, testified that he observed multiple layers of red mud outside of and below Area A in the West Ditch in September 2002.  He further testified that when he found these layers of red mud, he was with Black, SCA's environmental officer, who admitted to him that the layers of red mud pre-dated April 2002.  These releases, unlike the single April 2002 release, had not been disclosed before closing to the buyers of the Property.[8]  Green, it is important to emphasize, was a witness who was not affiliated with any party to this litigation.

There was also sufficient evidence presented for the jury to infer that Eric Black, Tom Russell, Larry Grace, or Joe Norton of SCA knew of these environmental violations prior to closing.[9]  Black and Russell were on the Property regularly at all relevant times.  Black testified that he knew that if red mud migrated away from Area A through a breach in an exterior dike

---

7. (...continued)
12 V.I.C. § 185(f).

8.  While the release occurred in March or April 2002, it is being described as the April 2002 release for ease of reference.

9.  As noted above, Russell acted as plant manager on the Property, and Grace was President of Alcoa World Alumina.

-18-

wall, it would be "an environmental problem."  A 1993
geotechnical and engineering report prepared by Bromwell &
Carrier documented instabilities in the dike walls of Area A due
to debris landfilled in the walls.  This report had not been
disclosed to SCRG or its predecessors prior to the closing.  The
report found that the instability had caused releases of red mud
from the southern dike wall prior to 1993.  The report further
noted that there was significant potential for future releases
based on the continued instability of the walls caused by the
debris.  Black supervised the team that prepared SCA's draft
Master Plan, which incorporated the Bromwell & Carrier report and
discussed its findings.  Dana Smith, a former SCA employee,
testified that she gave a copy of the draft Master Plan to Black.

        SCRG also introduced into evidence an April 16, 2002
email from Black to Norton, the chief environmental officer for
Alcoa World Alumina.  The e-mail immediately alerted Norton about
an April 2002 release, which was subsequently disclosed to SCRG
prior to closing.  That email provides in pertinent part:

> As a followup [sic] to this mornings [sic] e-
> mail regarding EA's concerns about residue
> runoff.  I went with Pat Mahoney late this
> afternoon to the area which he found to be
> impacted by residue runoff.  It is far more
> extensive than initially thought, extending
> to and possibly into the ocean.  I will be
> calling the local agency to report this today
> (completed to Aaron Hutchins at 17:00).  It
> appears the runoff occurred several weeks ago
> during a very heavy storm event.

This email establishes that Black and Norton understood the
seriousness of red mud releases.  The jury could reasonably infer

that they had a motive to mislead SCRG about the extent of the
problem.   SCRG also relies on a 2002 environmental analysis of
the Property prepared by Garver Engineering for SCA in response
to the disclosed April 2002 red mud release.   That analysis
documented several releases of red mud from Area A over the
facility's history.   It is undisputed that SCA withheld this
report during due diligence and represented to the buyers that
the April 2002 release had been a "one-time event."   The jury
could infer that SCA knew about the red mud releases prior to
closing and warranted to the contrary in the purchase agreement
in March 2002 and at the closing in June 2002.

Finally, as to SCA's claim that SCRG did not prove
justifiable reliance, the court has previously explained that
under Delaware law the predecessors of SCRG were permitted to
rely on any warranties in the purchase agreement unless they had
made such an investigation as would make the environmental
violations obvious to them.   See Craft v. Bariglio, 421 at 24
(Del. Ch. Mar. 1, 1984); Omar Oil and Gas Co. v. Mackenzie Oil
Co., 128 A. 392, 396 (Del. 1926).   On the verdict sheet, the
court posed the following special interrogatory to the jury: "Do
you find that the defendant has proven by a preponderance of the
evidence that the plaintiff made an investigation on its own that
did or should have made obvious to it those outstanding
violations of the environmental law?"   The jury answered, "No."

Based on the testimony of Mahoney and Haines, the jury
could reasonably find that the buyers' investigation was not of

-20-

such a nature and character that the multiple, prior red mud
releases would or should have come to light, especially if the
jury believed that SCA purposefully withheld the Bromwell &
Carrier report which described a past release and predicted
future releases.

There is sufficient evidence in the record for the jury
to have found that SCRG proved its fraud claim by clear and
convincing evidence.  Furthermore, since all of the elements of
SCRG's breach of warranty claim are included in the elements of
its fraud claim and the standard of proof is lower for SCRG's
breach of warranty claim, SCA's contention that SCRG did not
prove its breach of warranty claim by a preponderance of the
evidence also fails.

IV.

The jury awarded $12,617,867 on SCRG's claims for
breach of warranty and fraud in the inducement.  SCA contends
that SCRG failed to prove recoverable damages for these claims.
SCRG sought as damages the cost to build a retaining wall on the
south side of Area A to prevent future releases of red mud due to
dike wall instability.  At trial, SCA presented expert testimony
that proper vegetation of Area A would prevent any future
releases without the need to build an expensive retaining wall.
SCRG's experts held the opinion that building a retaining wall
was necessary.  The jury clearly agreed with SCRG and awarded it
the full cost of doing so.  SCA now asserts that the cost of a
containment wall was not the proper measure of damages for the

-21-

breach of warranty and fraud claims and that the cost was solely
speculative.

First, SCA maintains that the cost of a retaining wall
bore no logical relationship to the relevant measure of damages,
that is, the loss in value of the refinery property.  The court
instructed the jury on breach of warranty and fraud damages as
follows:

> 62.  If you find that the defendant breached
> its warranty in the purchase agreement for
> the refinery property,  then you may award
> compensatory damages to the plaintiff.  The
> plaintiff would be entitled to compensation
> in an amount that will place it in the same
> position it would have been in if the
> contract had been properly performed.  The
> measure of damages is the loss actually
> sustained as a result of the breach of the
> warranty.  Your award should reflect the loss
> in value of the refinery property as a result
> of any pre-April 2002 releases of red mud.
> Compensation for this loss can be achieved by
> awarding St. Croix Renaissance Group the
> reasonable cost of putting the refinery
> property in the condition in which it was
> represented to be.
> 63.  Plaintiff claims the only way to do so is to
> construct a containment wall along the southern
> perimeter of Area A.  Defendant maintains that
> contouring and vegetating Area A would have eliminated
> plaintiff's damages, if any.  Any contouring and
> vegetating of Area A is the responsibility of plaintiff
> under the purchase agreement.  If plaintiff has not
> proven that the construction of the containment wall is
> the necessary remedy to the breach of warranty, you may
> not award any damages for this breach.

The Delaware pattern jury instructions for breach of contract
provide that "If you find that one party committed a breach of
contract, the other party is entitled to compensation in an
amount that will place it in the same position it would have been

-22-

in if the contract had been properly performed.  The measure of damages is the loss actually sustained as a result of the breach of the contract."  This is virtually identical to the first three sentences of our instructions.  In this case, proper performance of the contract would have been the transfer of the Property in the condition in which it was represented to be in the warranties in the purchase agreement.  The court merely explained to the jury that compensation could be the reasonable cost of placing SCRG in the position it would have been in had those representations been true.

The Restatement (Second) of Torts, which has been cited with approval by Delaware courts, explains the proper measure of damages for fraudulent misrepresentation in a contract.  See Envo, Inc. v. Walters, 2009 Del. Ch. LEXIS 216, *24-*25 (Del. Ch. Dec. 30, 2009).  The Restatement (Second) of Torts provides that:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including: (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation. (2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

Restatement (Second) Torts § 549.  Compensating SCRG by repairing the Property such that it is in the condition warranted in the purchase agreement has the effect of giving SCRG "the benefit of [its] contract with" SCA.  Here, the retaining wall would prevent ongoing releases of red mud.  Such releases are the basis of SCRG's claims for breach of warranty and fraud.  The court's instructions to the jury were correct, and the reasonable cost of repairing the Property such that it would be in the condition that it was represented to be in the purchase agreement is a proper measure of damages.

SCA next contends that, even if a retaining wall could be a proper measure of damages, SCRG did not prove the cost of that remedy to a reasonable certainty.  While "speculative damages are not recoverable," SCRG did introduce two expert witnesses who testified about the efficacy, construction, and cost of building a containment wall on the property to prevent future releases of red mud from Area A.  See Tanner v. Exxon Corp., 1981 Del. Super. LEXIS 819, *6 (Del. Super. July 23, 1981).  These witnesses, John Ahlschwede and Jared Brown of Stanley Consulting, were qualified as experts under Daubert.  The court found that they had the requisite qualifications to render these opinions, that their methodology was sufficiently reliable, and that their opinions fit the questions presented in this case. Their testimony was unrebutted during the course of the trial. SCRG has proved its damages with reasonable certainty based on the evidence in the record concerning the necessity of a

containment wall to remedy the underlying problem that caused the undisclosed environmental violations and concerning the cost of the wall's construction.

V.

Finally, in its motion for judgment as a matter of law, SCA challenges the jury's award of $6,142,856 in punitive damages.  Under Delaware law, a jury may only award punitive damages "to punish a party for outrageous conduct and to deter a party, and others like it, from engaging in similar conduct in the future."  Delaware Pattern Jury Instructions (2010); see also State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003); Tackett v. State Farm Fire and Cas. Ins. Co., 653 A.2d 254, 265-66 (Del. 1995).  There was sufficient factual basis of SCA's hidden misrepresentations and the involvement of top officials at the company to sustain the jury's finding that the fraud was "outrageous."  The punitive award is less than fifty percent of the compensatory damages and bears a "reasonable relationship" to the harm SCRG suffered.  See Philip Morris USA v. Williams, 549 U.S. 346, 352-53 (2007).  There is no basis on which to overturn the jury's award of punitive damages.

VI.

We next turn to SCA's motion for a new trial under Rule 59 of the Federal Rules of Civil Procedure on the ground that the court committed a myriad of evidentiary errors.  SCA contends that the court erred in allowing SCRG to present to the jury a case different than the case it had pleaded, in admitting hearsay

-25-

and improper expert testimony over SCA's objections, in refusing to admit evidence important to SCA's defense, and in improperly defining various terms for the jury.  In most instances, we explained in detail before or during trial our rulings which are challenged again here.  The arguments of SCA are without merit and require no further discussion.

VII.

SCRG has requested that the court amend its January 20, 2011 judgment by adding prejudgment interest to the jury's award of $12,617,867 for breach of warranty and fraud.  SCA opposes this request because it contends that SCRG has not satisfied Delaware's statutory requirements for obtaining prejudgment interest for a tort claim such as fraud in the inducement.

In tort actions under Delaware law, prejudgment interest is available only where "prior to trial the plaintiff had extended to defendant a written settlement demand valid for a minimum of 30 days in an amount less than the amount of damages upon which the judgment was entered."  Del. Code. Ann., tit. 6, § 2301(d).  SCRG concedes that it made no such demand.  However, it maintains that the jury's award of $12,617,867 is properly considered an award for a breach of warranty, not under a tort theory for fraud.

Under Delaware law, the court may award prejudgment interest in all contract actions where the damages are unliquidated and proven by pecuniary testimony.  See Rollins Envtl. Servs., Inc. v. WSMW Indus., Inc., 426 A.2d 1363, 1366

(Del. Super. 1980).  There are no additional requirements for
requesting prejudgment interest on contract claims.[10]

          The terms of the purchase agreement between SCA and
SCRG precluded SCRG from recovering in excess of $3,000,000 for
any breach of warranty.  The court constructed a series of
special interrogatories which it posed to the jury.  It first
asked, "Do you find that the plaintiff St. Croix Renaissance
Group has proven by a preponderance of the evidence that the
defendant St. Croix Alumina knew about and nonetheless failed to
disclose to the plaintiff in the purchase agreement or Exhibit
8.1.6 or either of the two identified Environmental Reports any
outstanding violations of the environmental law?"  If the jury
answered that question in the affirmative, it was also asked to
answer the following interrogatory:  "Do you find that the
plaintiff has proven by clear and convincing evidence that the
defendant committed fraud by knowingly making a false warranty in
§ 8.1.6 of the purchase agreement?"  Since the jury answered

---

10.  We note that in Delaware state courts, parties must
specifically plead a claim for prejudgment interest in its
complaint.  See Chrysler Corp. v. Chaplake Holdings, Ltd., 822
A.2d 1024, 1037 (Del. 2003).  However, procedural issues before
this court are governed by the Federal Rules of Civil Procedure,
which provide that "final judgment should grant the relief to
which each party is entitled, even if that party has not demanded
that relief in its pleadings." Fed. R. Civ. P. 54(c).  See also,
W.R. Huff Asset Mgmt. Co. v. William Soroka 1989 Trust, Civ.A.
No. 04-3093, 2009 U.S. Dist. LEXIS 68809, *7-*8 (D.N.J. Aug. 6,
2009), aff'd 398 Fed. App'x. 806 (3d Cir. 2010); Telecordia
Techs., Inc. v. Cisco Syst., Inc., 592 F. Supp. 2d 727, 749 (D.
Del. 2009), aff'd in relevant part 612 F.3d 1365, 1379 (3d Cir.
2010).

"Yes" to both of those questions, it was required to answer the following damages interrogatory:  "What amount of compensatory damages, if any, do you award to the plaintiff for the defendant's breach of the warranty  in the purchase agreement and for the defendant's fraud in the inducement?"

The jury awarded a total of $12,617,867.  This sum represented damages for both breach of warranty and fraud, not merely for breach of warranty alone.[11]  While the purchase agreement provided a cap of $3,000,000 in damages for breach of contract, the jury awarded an additional sum of $9,617,867.  Without the breach of warranty, there could have been no damages for fraud.  We conclude that the first $3,000,000 represented damages for breach of contract and the remaining $9,617,867 is properly considered an award of damages for SCA's fraud.  Accordingly, we will add prejudgment interest on $3,000,000.

Under Delaware law, SCRG is entitled to prejudgment interest at a rate of 5% over the Federal Reserve discount rate as of the time that interest became due.  <u>See</u> Del. Code Ann. tit. 6, § 2301(a).  Interest is calculated from the date of the loss, which in this case is June 14, 2002, the date that SCRG's predecessors closed on the Property, until January 20, 2011, the

---

11.  The jury was not told about the $3,000,000 cap in the purchase agreement in the jury instructions on the ground that it would be confusing the jury and unduly prejudicial to SCA.  SCRG objected to this omission from the charge, but the court overruled that objection.  Had the jury returned a verdict for SCRG on the breach of contract claim only, the court would have molded the verdict if necessary.

date when judgment was first entered.[12]  See Pierce Assoc., Inc. v. Nemours Foundation, 865 F.2d 530, 547 (3d Cir. 1988).  The Federal Reserve discount rate on June 15, 2002 was 1.25%.  Making the calculation based on simple interest, the prejudgment interest due is $1,613,527.  We will amend the judgment to reflect this amount.

---

12.  SCRG, of course, is entitled to post-judgment interest on the entire amended judgment from January 20, 2011.  See 28 U.S.C. § 1961.